**M.N.C. OF HINESVILLE, INC.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES DEPARTMENT OF DEFENSE, Defendants-Appellees.**

No. 85–8041.

United States Court of Appeals,
Eleventh Circuit.

June 23, 1986.

As Amended June 24, 1986.

George L. Lewis, Brent J. Savage, Savannah, Ga., for plaintiff-appellant.

Lawrence B. Lee, Melissa S. Mundell, Asst. U.S. Atty., Savannah, Ga., Wendy M. Keats, Robert S. Greenspan, Peter R. Maier, Richard A. Olderman, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellees.

Before GODBOLD, Chief Judge, KRAVITCH, Circuit Judge, and SIMPSON, Senior Circuit Judge.

GODBOLD, Chief Judge:

M.N.C., publisher of a newspaper in Hinesville, Georgia, filed this suit seeking injunctive relief and mandamus against the Department of Defense ("DOD") challenging actions undertaken by DOD's agent, the Army. M.N.C. challenged the Army's decision awarding another publisher, Jesup Press-Sentinel, Inc. ("Jesup") a contract to publish a Civilian Enterprise Newspaper to be distributed at Fort Stewart and Hunter Army Airfield, both located near Savannah, Georgia. M.N.C. also alleged that the Army accorded Jesup preferential treatment in violation of its rights under the First and Fifth Amendments. The court conducted a final hearing and, after considering affidavits submitted by both sides, granted DOD's motion for summary judgment on these constitutional claims. We hold that the Army's actions did not infringe M.N.C.'s constitutional guarantees and affirm the district court.

## I. FACTS

### A. A Civilian Enterprise Newspaper

DOD has promulgated regulations establishing procedures under which a military base can provide information to its personnel through distribution of a free newspaper. Through such a newspaper DOD can pass on to its military and civilian employees information that would not normally be available through regular commercial newspapers. *See* 32 C.F.R. § 202.1(b). These newspapers fall into two general categories. Armed Forces Newspapers, 32

C.F.R. § 202.4(a), are published directly by the military, and the costs of publication are paid for by the government either through appropriated or nonappropriated funds. There are three types of Armed Forces Newspapers: "Authorized newspapers," which are published by the military base itself, "overseas Unified Command newspapers," such as *Stars and Stripes,* and "News bulletins and news summaries," which are unofficial publications of local commands and ships that are used when daily newspapers are not readily available. 32 C.F.R. § 202.7(a). The distinguishing feature of all these publications is that they are produced and paid for by the military.

The second type of newspaper a military base may use to distribute information to its personnel is a Civilian Enterprise Newspaper ("CEN"). CENs are published by commercial civilian publishers pursuant to contracts with individual military bases. In addition to traditional news sources such as wire services CENs receive information for publication directly from the military. 32 C.F.R. § 202.4(b)(5). By securing commercial publishers the military is able to secure dissemination of the information it wants at no cost to itself. DOD or a military base may expend funds on a CEN only to buy individual copies of the publication for distribution to personnel if the publisher is unable to secure sufficient revenue from other sources to make publication feasible. 32 C.F.R. § 202.6(b). A military installation is prohibited from contracting for a CEN unless it establishes that "the resources of subordinate commands or activities preclude publication of Armed Forces Newspapers." 32 C.F.R. § 202.-4(b)(1). A military installation may have only one CEN. 32 C.F.R. § 202.4(b)(2).

DOD regulations impose significant constraints over the material that may appear in a CEN. All news must be factual, objective, and in good taste. The newspaper must distinguish between facts and opinions and identify the source of all opinions. It may not contain any news or editorials relating to political campaigns. 32 C.F.R. § 202.3(b). If it carries a paid political advertisement it must give equal opportunity to all opposing candidates. 32 C.F.R. § 202.3(c). A CEN is prohibited from publishing polls, surveys, and straw votes relating to political issues. 32 C.F.R. § 202.-3. In addition to operating under these constraints the CEN also must submit to review by the commander of the military installation, 32 C.F.R. § 202.4(b)(1), who has the authority to prohibit distribution of any single issue of a CEN (or any other newspaper) if he considers it to be "unlawful or prejudicial to good order or discipline" or contains an advertisement that he "determines will not be in the best interest of his command." 32 C.F.R. § 202.4(b)(6). If the publisher of the CEN fails to abide by these standards the base commander may terminate the publisher's contract. Army Reg. 360–81 IV § 3–17(e).

When a publisher agrees to publish a CEN it does not, however, become an instrument of the federal government. DOD personnel are forbidden from serving on the editorial staff. 32 C.F.R. § 202.11. All information given to a CEN by the military must be made available equally to any other publisher who requests it. 32 C.F.R. § 202.11(a)(1). A CEN may not state that it is an authorized armed services publication, nor may it display official seals, insignia, or emblems of the United States or any of the military branches. On the front page of every issue a CEN must display this disclaimer:

> Published by (name of publishing company), a private firm in no way connected with (appropriate military department or defense agency). Opinions expressed by the publishers or writers herein are their own and are not to be considered an official expression of (appropriate military department or defense agency). The appearance of advertisements in this publication, to include inserts, does not constitute an endorsement by the (appropriate military department or defense agency) of the products or services advertised.

32 C.F.R. § 202.11.

While the publisher of a CEN gives up some of the autonomy of an ordinary com-

mercial newspaper, it receives some benefits. DOD regulations provide that a CEN can be distributed either through DOD's official channels or directly to the intended readership. 32 C.F.R. § 202.12(a). This is a benefit that no other commercial newspaper enjoys.

DOD selects the publisher of a CEN based upon competitive bids, open to all interested and responsible publishers with each publisher given a fair and equal opportunity to submit bids. 32 C.F.R. § 202.-11(b). Selection of the CEN publisher is based upon the "best obtainable offer and the price per copy of his newspaper, if any," with due care taken to select a competent, reliable, and responsible publisher. 32 C.F.R. § 202.1(b)(3). Nothing in the regulations suggests that DOD is to base its selection on the views espoused by the competing publishers.

### B. CEN publication at Fort Stewart/Hunter

Prior to 1983 the Army at Fort Stewart/Hunter published informational materials itself and distributed them to its personnel through its own facilities and using its own resources. In 1983 it decided to establish a CEN for these installations, to be named *The Patriot*. M.N.C. was licensed as its publisher. The contract between the Army and M.N.C. granted M.N.C. a license to publish *The Patriot* for one year and included an option for the Army to extend the contract for another year. During 1983 M.N.C. distributed *The Patriot* to places at Fort Stewart/Hunter to which other newspapers had no access, such as troop lounges, barracks, and day rooms. All other newspapers, however, were, and still are, permitted to be distributed on the base only at designated newsstands. For the 1984 year the Army chose not to exercise its option and instead reopened the bidding process. Although M.N.C. submitted a bid to continue publishing *The Patriot*, the Army selected Jesup to be the CEN publisher for 1984.

The Army's contract with Jesup imposed restrictions on the content of *The Patriot*. In addition to the restrictions contained in the DOD regulations, *The Patriot* could not contain material that denigrated the Army; it was only permitted to carry "material that reflects the standards of decency which characterizes our military forces...." R. 329. Jesup also was required to submit a copy of each issue of *The Patriot* to the officials at Fort Stewart/Hunter for their approval before distributing the newspaper to the troops. R. 339. As the district court noted, "[T]he viewpoint necessarily advocated in the CEN is pro-Army." R. 343.

After learning that it would no longer publish *The Patriot*, M.N.C. began to publish a newspaper called *Coastal Courier's Army Advocate* that was aimed at the same market as *The Patriot*. The *Army Advocate* does not differ greatly in format from *The Patriot*. Both contain news, sports, entertainment, articles, features, and information supplied by the Public Affairs Office of Fort Stewart/Hunter as well as material supplied by United Press International and Reuters. The *Army Advocate*, like *The Patriot*, is supported by revenues from commercial advertisements. Throughout this litigation M.N.C. has asserted that the content of the *Army Advocate* mirrors that of *The Patriot*. *See, e.g.*, Dist.Ct.Op. at R. 330–31 ("According to plaintiff, the ... *Army Advocate* and *The Patriot* as published by [Jesup] are identical in their substantive content."). In order to compete against *The Patriot*, M.N.C. requested that the Army provide it with the same information that it provided to *The Patriot* and that it be allowed to distribute its paper in the same time, place, and manner as *The Patriot*. The Army denied these requests.

M.N.C. then brought this suit seeking equal access to information provided to *The Patriot* and access to the points of distribution where *The Patriot* was allowed to be distributed ("access points").[1] It also

---

**1.** There has been considerable ambiguity concerning what M.N.C. contends it has been ex-

cluded from and what it seeks access to. There are references to M.N.C. seeking equal access to

claimed that its constitutional rights were violated by the Army's providing free wire service information to *The Patriot*. At the temporary injunction stage DOD conceded the right of M.N.C. to equal access to the information supplied *The Patriot*, and this issue dropped out of the case. M.N.C. also asserted that the Army wrongfully interfered with its business relations by advising its customers and advertisers that the *Army Advocate* is not the Army's CEN and is not distributed in the same manner as the CEN, and that the Army acted arbitrarily and capriciously in denying its bid to continue publishing the CEN in 1984. After a hearing the district court denied M.N.C. preliminary injunctive relief. After considering affidavits supplied by both sides and holding a second hearing, the court entered judgment for DOD on the remaining claims. It dismissed the claim for interference with business relations under Fed.R.Civ.P. 41(b) for failure to prosecute, and it held on the merits for the Army on the claim that the award was arbitrary and capricious on the ground that a rational choice was made in selecting Jesup over M.N.C. M.N.C. has not argued these issues on appeal. The court granted summary judgment to the DOD on the constitutional claims on the ground that as a matter of law the differential treatment between *The Patriot* and M.N.C. was reasonable. M.N.C. does not assert that a genuine issue of material fact prevented summary judgment. Instead it contends that as a matter of law *The Patriot*'s access to points of distribution from which the *Army Advocate* and other newspapers are excluded violates M.N.C.'s rights under the First and Fifth Amendments.

## II. THE FIRST AMENDMENT CHALLENGE

■ It is obvious that M.N.C. engages in activity protected under the First Amendment when it publishes the *Army Advocate*. Conceding this, the government contends that the First Amendment's protections do not reach this case. It begins with the premise that the First Amendment would not have been implicated had the Army chosen the alternative of publishing an Armed Forces Newspaper containing the identical information as *The Patriot* and distributed this newspaper through its internal distribution network. In such a situation the Army would be merely using its own internal distribution network to disseminate information it thought necessary for the troops to receive. Because, the Army argues, the use of an Armed Forces Newspaper would not fall within the bounds of the First Amendment, its use of a CEN to perform the same function must lead to the same conclusion; *i.e.*, *The Patriot* as a surrogate for an Armed Forces Newspaper does not enjoy First Amendment protection, so the Army has not favored one constitutionally protected speaker over another.

■ Even assuming that internal publication and exclusive distribution of an Armed Forces Newspaper identical to *The Patriot* would not raise First Amendment concerns, the government's argument must be rejected. It equates internal governmental communication with speech undertaken by an outside commercial publisher. This equation is fundamentally flawed. Jesup is publishing a civilian newspaper. *The Patriot* contains feature articles, news items, sports, and editorials. Although the Army, through its regulations and day-to-

---

Fort Stewart/Hunter; to seeking access to the Army's internal distribution system; to access to the Adjutant General's distribution system; access to battalion, brigade and company areas; access to distribution channels; access to mess halls, barracks and troup lounges. In its brief M.N.C. states that it "wishes to distribute *The Army Advocate* at the lounges, dining halls, libraries, barracks, day rooms and other non-designated news stands in and around Fort Stewart and Hunter Army Airfield where *The Patriot* is

allowed to be distributed." Appellant's Brief at 14. It also contends, "This case is also not about restricting distribution access to all areas of the military installation. On the contrary, the Army merely wishes to restrict appellant's distribution to areas where newsstands currently exist while allowing only the C.E.N. to be distributed at all other areas of the base." Appellant's Brief at 17. We accept the above quotations as correctly stating what it contends it has been excluded from and seeks access to.

day review of *The Patriot,* does affect the content of the CEN, there is no indication that it does or can dictate the entire content of the newspaper. And the newspaper, as required by Army regulations, holds itself out to be a civilian operation. Further, nothing in the regulations suggests that distribution of the CEN must be confined to the military base. Indeed, copies of *The Patriot* were available in local supermarkets off the base. *The Patriot* has not lost its private status and become an instrument of the government; rather, the Army has chosen one commercial newspaper among a number of competing newspapers and granted it preferred access to the military base. In doing so it has drawn an explicit classification among speakers engaged in constitutionally protected activity. That the military might have pursued its objective through other means that would not have offended the Constitution is irrelevant.

■ Thus we conclude that the government actions affect activity that falls within the scope of the First Amendment. The next step is to determine the level of protection that the Constitution affords the activity. Such protection is defined in terms of the level of justification that the government must provide for its action. As the level of protection the Constitution affords an activity increases, the latitude the government has in providing an acceptable justification decreases. In the case of activity protected by the First Amendment two factors determine the burden that the government must shoulder in justifying its action. These are the nature of the forum where the speech takes place and the nature of the restriction placed on the speech.

A. The nature of the forum

■ The location where a speaker conveys or wishes to convey its message is relevant to deciding whether government regulation of that speech is permissible. While the government may not forbid a demonstration in front of a state capitol, *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), it may forbid similar conduct in front of a state jail, *Adderly v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). To determine the effect of the location on the degree of protection afforded that speech, the Supreme Court has devised an analytical framework that divides government property into traditional public forums, created public forums,[2] and nonpublic forums. *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983).

■ Traditional public forums are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). Parks and streets are the quintessential examples of traditional public forums. The government's power to circumscribe speech in these areas is at its minimum.

■ Created public forums are areas that "the State has opened for use by the public as a place for expressive activity." *Perry, supra,* 460 U.S. at 45, 103 S.Ct. at 954. Although the government is not required to open these forums to the public, once it does so the Constitution imposes significant constraints on its power to regulate speech in these areas. Examples of created public forums are university meeting facilities, *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), school board meetings, *City of Madison Joint School District v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), and a municipal theater, *Southeastern*

2. The parties call forums in this second category "limited" public forums. We eschew this terminology because it is misleading. Although the government, when it turns property from a non-

public forum into a public one, may do so only for a limited purpose, see text *infra,* it also may open the forum to the same extent as a traditional forum.

*Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1976).

■ Nonpublic forums are areas that are not traditionally public forums and have not been opened by the government for public use. *Perry, supra,* 460 U.S. at 46, 103 S.Ct. at 955. Although the government is not free from restraints in regulating speech in nonpublic forums, it is in these areas that it enjoys its widest latitude in restricting speech.

■ The district court held that Fort Stewart/Hunter is a nonpublic forum. We agree. Military bases generally are non-public forums. *See Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). In *Greer* the Supreme Court observed that historically military commanders have enjoyed the power to restrict access to their bases. The Court noted the important role that the military plays in American society and stated that "the business of a military installation … [is] to train soldiers, not to provide a public forum." *Id.* at 838, 96 S.Ct. at 1217. It has never called this characterization into question. *See U.S. v. Albertini,* —— U.S. ——, ——, 105 S.Ct. 2897, 2904, 86 L.Ed.2d 536, 545 (1985) ("A military base … is ordinarily not a public forum for First Amendment purposes….").[3]

M.N.C. acknowledges that Fort Stewart/Hunter is normally a nonpublic forum but asserts that actions by the Army have created a public forum within it. It contends that by allowing *The Patriot* to be distributed through access points that are off limits to other newspapers, the Army has turned these access points into a public forum to which all newspapers similar to *The Patriot* must be given equal access.

We agree with the district court that this contention is foreclosed by *Perry.* There a teachers' union sought access to teachers' mailboxes. Prior to a representation election the teachers in the Metropolitan School District of Perry Township were represented by two rival unions. Both unions were allowed access to the mailboxes. After a representation election only the elected bargaining representative was granted access to the mailboxes. The Supreme Court held that the mailboxes were generally a non-public forum and that the school board's granting access to one union and a variety of social organizations such as the Cub Scouts and the YMCA did not turn the mailboxes into a public forum.

The Court began its analysis with the observation that, although the school board did not enforce a total ban on access to the mailboxes, neither did it open them up to indiscriminate use by the public. It held that selective access does not necessarily turn a nonpublic forum into a public one. It also held that by allowing one union access to the mailboxes the school board did not create a public forum for all unions. Rather, it noted that the school district was enforcing a regulation that discriminated against unions based on their status. Although the complaining union at one time had access to the mailboxes, by losing the union election it no longer represented teachers in the district. The Court noted that restricting access to unions that represented the members of the bargaining unit was consistent with the school board's desire to preserve the mailboxes for school-related business.

The Army's actions in this case did not change the access points in question into a

**3.** Only once has the Supreme Court held that a military area had been converted into a public forum. In *Flower v. U.S.,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), the Court found that the military had abandoned any claim to a special interest to a street running through Fort Sam Houston by allowing indiscriminate use by the public. Subsequent decisions have emphasized the narrow reach of *Flower. See Albertini,* —— U.S. at ——, 105 S.Ct. at 2904, 86 L.Ed.2d at 545 ("*Greer* clarified that the significance of the per curiam opinion in *Flower* is limited by the unusual facts underlying the earlier decision."); *Greer,* 424 U.S. at 835, 96 S.Ct. at 1216 ("The decision in *Flower* was … based upon the Court's understanding that [the military avenue in question] was a public thoroughfare in San Antonio no different from all the other public thoroughfares in that city…."). *Flower* does not control the present case as there is no suggestion that the military has abandoned its interest in the forum in question by opening it up to indiscriminate use by the public.

public forum. The access allowed *The Patriot* is more limited than the access to the mailboxes in *Perry*. While the school district in *Perry* allowed outside organizations other than the incumbent union to use the mailboxes, nothing in the present record indicates that any nonmilitary organization other than the CEN is authorized to distribute material through the access points. M.N.C. attempts to distinguish *Perry* on the ground that in *Perry* it was the teachers who conferred the preferred status on the union while here the government itself chose which publisher was to publish and distribute *The Patriot*. This distinction does not persuade us that the forum in this case differs from the one in *Perry*. In both cases the government has chosen to give one group, based on its status, benefits denied others. Although the method by which this status is conferred may affect the determination of whether the restriction is the product of impermissible viewpoint discrimination, it does not affect the type of forum to which the restriction applies. Accordingly, we affirm the holding of the district court that the access points at Fort Stewart/Hunter to which *The Patriot* is granted access and from which other papers are excluded do not constitute a public forum.

**B. The nature of the restriction**

 Identifying the nature of the forum does not identify the level of justification the government must provide to sustain its regulation of speech. While the government may not prohibit the Communist Party from holding a public rally because it does not endorse the principles the party espouses, *see Yates v. U.S.*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), it may prevent all persons, including communists, from distributing leaflets in or upon any street, sidewalk, or park, *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed.

155 (1939). The inquiry into justification turns not on the nature of the forum but rather on whether the regulation of speech is based on its content (content based) or it is merely regulation of the time, place, and manner of speech irrespective of content (content neutral). This content-based/content-neutral distinction has come to play a major role in contemporary First Amendment analysis.[4] *See* Stone, *Content Regulation and the First Amendment*, 25 Wm. & Mary L.Rev. 189, 189 (1983) (The content-based/content-neutral distinction is "the most pervasively employed doctrine in the jurisprudence of free expression.").

 We do not need to discuss the standards for justifying government regulation of speech in public forums and created public forums other than to note that the government shoulders a more stringent burden when it restricts speech in those forums than when restricting speech in a nonpublic forum. Once speech enters the realm of nonpublic forums the government's power over its regulation increases dramatically. As in all other forums, the government may subject speech in nonpublic forums to reasonable content-neutral, *i.e.*, time, place, and manner, restrictions. *See Perry*, 460 U.S. at 45–46, 103 S.Ct. at 954–55. In addition, the government may enact content-based restrictions that "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry, supra* at 46, 103 S.Ct. at 955. In short, content-based restrictions imposed in nonpublic forums may fall into two categories, those that distinguish between the views of certain speakers (viewpoint based) and those that do not (viewpoint neutral).

*Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), considered the

---

**4.** Because the restrictions at issue in this case turn on the status of the respective newspapers and not on the subject matter contained in each, we need not wrestle with the difficulties inherent in judging the validity of subject matter restrictions (restrictions based upon subject matter rather than viewpoint). For a discussion of the problems raised by such restrictions, *see* Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions*, 46 U.Chi.L.Rev. 81 (1979).

second type of restriction. There the Supreme Court upheld the Army's prohibition of a candidate for political office from campaigning on a military base. It is clear that this restriction was based on the content of the speech at issue and would have been struck down if it had been applied in a traditional or created public forum, *cf. Metromedia, Inc. v. San Diego*, 453 U.S. 490, 513, 101 S.Ct. 2882, 2895, 69 L.Ed.2d 800 (1981) ("Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages.") (plurality opinion). The Court justified upholding the ban on political speech in *Greer* on the ground that the military base was a nonpublic forum. It was careful to note, however, that the candidate was excluded not because the government did not favor the views he espoused but rather as part of a broad policy excluding all political discussion from military bases. In other words, the restriction, though based upon content—political discussion—was viewpoint-neutral.

Having described the nature of the forum as nonpublic and the standards for measuring governmental regulation of speech in a nonpublic forum, we turn to the contentions of the parties. M.N.C. makes two distinct attacks on the Army's decision to allow *The Patriot* but not the *Army Advocate* into the nonpublic forum we have described at Fort Stewart/Hunter. First, it contends that the Army selected Jesup to publish the CEN because the Army sought to promote the views Jesup espoused, that is, it engaged in viewpoint-based discrimination. Second, it contends that the limited access regulations are unreasonable.

### 1. Viewpoint-based discrimination

 To discern whether the Army, when it chose Jesup over M.N.C., sought to promote Jesup's views it is necessary to review the procedures by which the Army chose the CEN for Fort Stewart/Hunter.[5] It began its decisional process by soliciting bids for the CEN license. In the solicitation the Army included this language:

> Any award to be made as the result of this Request for Proposals will be based upon the best overall proposal with appropriate consideration given to the following major factors: services, technical, management and special services—in that order of importance. Of the four factors set forth, "service" is the most important and of greater weight than either of the three other factors considered separately....

R. 350.

The Army established a board to evaluate the three proposals it received. The board members were given score sheets containing a number of objective criteria pertaining to the factors mentioned in the bid solicitation. Of the three members on the Army's board one member awarded the same number of total points to M.N.C. and Jesup, another scored a one-point margin for Jesup, and the third found that M.N.C. edged its competitor by a point. All three members, however, added a note to the bottom of their score sheets indicating that they thought the Army should employ Jesup instead of M.N.C. R. at 356–57. One member based his recommendation on his belief that Jesup was "more professional" and that it had a "dedicated office." A second was impressed by Jesup's "quality of post publications, quality of proposed equipment, type and location of proposed office, and dedicated employees...." The third stated that because of the full-time office Jesup would provide and the problems that the Army had had with M.N.C. the previous year, "the Jesup Sentinel would produce a better product for us overall...." The head of the recommendation committee considered these recommendations, made his own independent review of

---

**5.** The district court found that any publisher granted a license to publish a CEN would necessarily be pro-Army because of the constraints imposed by the applicable regulations. M.N.C. has not questioned either the finding or the requirement that the CEN be pro-Army. Indeed, it has expressed its willingness to abide by the military's content regulations. *See* Appellant's Brief at 21 ("*The Army Advocate* in shape, form, substance, and objectives is identical to *The Patriot*").

the bids, and recommended to his superiors that Jesup be awarded the contract. R. at 353. His superiors accepted this recommendation. After reviewing these facts the district court concluded: "[I]t appears to the Court that the Army acted with experience and a good faith effort to choose a newspaper publisher which would best serve the purpose of the CEN scheme: to get the troops to read Army bulletins and engender interest in the community." R. 355.

The above facts, which are not in dispute, provide no inference that the Army engaged in impermissible viewpoint discrimination when it selected Jesup over M.N.C. No evidence suggests that Jesup was selected over M.N.C. because of the views it would express in *The Patriot*. Indeed, M.N.C. throughout this litigation has contended that the content of the *Army Advocate* mirrors that of *The Patriot*. *See, e.g.*, Brief for Appellant at 50 ("Factually and as a practical matter no distinction exists between *The Army Advocate* and *The Patriot* except for the existence of the C.E.N. license itself.").

2. Are the restrictions on access points reasonable?

Because the Army's differential treatment of the competing newspapers is not based on their views, the test, as we have noted above, is whether the restriction is reasonable. This determination is to be made "in light of the purpose which the forum at issue serves." *Perry*, 460 U.S. at 49, 103 S.Ct. at 957. The forum at issue here is used for the daily operations of the base. We take judicial notice that these operations are crucial to maintaining and operating the base. Few would question the importance that bases like Fort Stewart/Hunter play in maintaining our national security. Thus the question narrows to whether limiting access to *The Patriot* is consistent with this purpose. The district court found that it is and we agree.

In order to evaluate the reasonableness of limiting access to the CEN it is necessary to first identify the function it serves.

As the district court noted, "The CEN is a special newspaper." R. 343. The military has an interest in distributing to its personnel material that is not otherwise readily available. This information, whether or not crucial to national security, undoubtedly enhances the quality of life on a military base. By informing its personnel of upcoming events and reporting on the success of past events the Army furthers a sense of community on the base. *See* Dist.Ct. Op.R. 355 (the purpose of a CEN is to "get the troops to read Army bulletins and engender interest in the community."). Establishment of a CEN allows the government to further its interest in disseminating this information while imposing no costs on the taxpayers.

In view of this function that a CEN serves, it is reasonable for the Army to grant it special distribution rights. The district court observed: "[T]he CEN is the chosen mechanism by which the Army disseminates information to its troops.... One sure way the Army can distinguish for its troops the importance between the CEN and other news media is to distribute it through exclusive channels." R. 344–45. We agree with this reasoning. Further there has been no attempt by M.N.C. to show that it lacks alternative channels to convey its message. The Supreme Court in *Perry* held that the availability of such channels supports the reasonableness of the restriction under attack. 460 U.S. at 53, 103 S.Ct. at 959.

 Another factor in upholding the reasonableness of granting preferential access to a CEN is the effect this monopoly over access points may have in increasing the number of publishers willing to publish a CEN. Although the district court did not consider this factor, it is reasonable to assume that the preferential access rights have economic value either in terms of increasing the number of advertisers willing to place ads in a CEN or increasing the rate that the publisher can charge the advertisers. This potential value might induce publishers to bid on a CEN contract even though they would not have bid ab-

sent the government-assured monopoly. Thus, the challenged preference is reasonable because it enhances the possibility that the Army will have an adequate supply of publishers when it solicits bids to publish a CEN.

C. Miscellaneous First Amendment challenges

██ There is no merit to M.N.C.'s contentions that the restrictions at issue constitute an unconstitutional subsidy and create an unconstitutional monopolization. The cases it relies on involve speech occurring in a public or created forum. *See, e.g.,* *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (cited for proposition that government may not subsidize one newspaper to the detriment of another); *FCC v. League of Woman Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (cited for proposition that government cannot create a monopoly on speech absent a compelling state interest). These cases, and the principles they set out, are inapplicable to a nonpublic forum.

### III. THE FIFTH AMENDMENT CHALLENGE

██ *Perry* forecloses the contention that the equal protection component of the Fifth Amendment mandates that it receive the same treatment as the publisher of *The Patriot.* In *Perry* the union couched its challenge in terms of equal protection as well as in more traditional First Amendment dress. The Court noted that because the plaintiffs failed to establish that any fundamental right they had was being impinged upon, the restriction merely had to pass traditional rationality review. 460 U.S. at 54, 103 S.Ct. at 959. This reasoning extends perforce to this case. Here the regulations at issue easily pass rationality review for the same reasons that they were not unreasonable when examined under the First Amendment.

AFFIRMED.