Tom **SWARNER, and Jane Swarner, and the marital community thereof, et al.; the Ranger Publishing Company, Inc., a Washington corporation, Plaintiffs–Appellees,**

v.

**UNITED STATES of America; Richard Cheney, Secretary of the Department of Defense; Larry Else; Michael P.W. Stone, Secretary of the Department of the Army; Callum A.H. Waller, Commander, Fort Lewis, Defendants–Appellants,**

**and**

**Robinson Publishing Corporation, a Washington corporation, Defendant.**

No. 90–35444.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1991.

Decided July 5, 1991.

Peter R. Maier, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

Guy J. Sternal, Eisenhower, Carlson, Newlands, Reha, Henriot & Quinn, Tacoma, Wash., for plaintiffs-appellees.

Before WRIGHT, FARRIS and THOMPSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

In this appeal from summary judgment we decide two issues. We first consider whether the Army must treat *The Ranger*, a weekly newspaper, as a paid subscription publication and permit its door-to-door distribution in Army post housing. We then review the district court's order requiring the Army to release internal news and information to *The Ranger* immediately, rather than after publication of the Army's own civilian enterprise newspaper.

## BACKGROUND

*The Ranger* was the civilian enterprise newspaper (CEN)[1] at Fort Lewis, Washington from 1951–89. It was published by Ranger Publishing Company, Inc., of which

---

1. A CEN is a means for a military command to communicate economically with its troops. *See generally* DoD Newspaper and Civilian Enterprise Publications, 32 C.F.R. Part 297 (1990). The command competitively selects a commercial publisher, then provides it with the news and information constituting the CEN's editorial content. Its publisher covers its costs and may earn a profit by selling advertising in the paper. "The contracting organization guarantees first publication and distribution of the editorial con-

Tom Swarner is owner and president.[2] As the CEN, *The Ranger* was distributed free, door-to-door, in the post's residential areas. Distribution of other free, nongovernmental publications was limited to the post's general use areas.

In the latter part of 1989, the Army notified Ranger that its CEN contract would not be automatically renewed. The Army solicited bids for a CEN publisher and selected Robinson Publishing Corporation. The Army–Robinson contract, signed on September 11, called for Robinson to begin publishing a CEN on November 2, using the name *"The Ranger."*

Three lawsuits followed. Ranger sued Robinson in state court, charging trademark infringement, unfair competition and unfair trade practices stemming from Robinson's use of the name *"The Ranger."* [3] Robinson impleaded the government which removed to federal court. Meanwhile, Robinson filed another federal action for a declaratory judgment that it had the right to call the CEN *"The Ranger."*

Ranger initiated a third federal action for injunctive relief against the Army. It alleged violation of federal regulations in awarding the Army–Robinson contract, violation of Ranger's right to distribute its paper at Fort Lewis and violation of its right to receive news and information on an equal basis with the CEN. Robinson intervened and the three cases were consolidated.

Following an expedited hearing on the contract award, the district court set it aside. The court found that the Army violated its regulations by not providing Ranger the opportunity to make a personal presentation to the selection committee. The Army rebid the contract.[4] Ranger's other claims remained.

Swarner continued to publish *The Ranger.* He sought Army authorization to distribute it in both common and residential areas of Fort Lewis. The Army initially denied these requests, asserting that it owned the paper's name and contending that Ranger's use of the name would be misleading to base readers. At trial on the contract award claim in late October, the Army represented that it would treat Swarner as it did any other newspaper publisher with reference to distribution on Fort Lewis. It then permitted door-to-door delivery of *The Ranger* throughout Fort Lewis family housing in the manner permitted for commercial subscription newspapers.

This situation was short-lived. On November 22, 1989, the commanding general at Fort Lewis issued a local regulation reaffirming that paid subscriptions could be delivered to the doors of post residents, but defining "paid subscriptions" in a way that excluded *The Ranger.*[5] The Army

---

tent in the [CEN] publication." *Id.,* App. B, ¶ F.1.

**2.** We refer to Swarner and his publishing company collectively as "Ranger."

**3.** In 1979, Swarner had registered *The Ranger* as a trademark protected by Washington state law for ten years. Even so, the 1984 and 1986 CEN contracts between Swarner and the Army contained a clause stating that the name *"The Ranger"* was the commanding general's property and would not be subject to trademark registration by the publisher.

**4.** Ranger bid again and lost again. In a related appeal, Nos. 90–35683 & 91–35001, we consider whether Ranger is entitled to a preliminary injunction of the CEN contract between the Army and Kitsap Newspaper Group, which won the rebid contract.

**5.** In pertinent part, the local regulation provided:

Paid subscriptions are agreements between an installation resident and a publication distributor/publisher to receive a publication in exchange for an amount of money, paid by the recipient, for a specified period of time. Paid subscriptions may only be hand delivered door-to-door upon the request of the resident. Publications ... which are gratuitous (at no cost to the recipient) may not be hand delivered door-to-door but ... may be placed in stands or racks. Gratuitous publications are those ... which do not generally charge and collect from recipients for the publication, which generally only request donations from recipients to receive the publication, or which are delivered regardless of the identity of the occupant. Prior to making any distribution on the installation, the publisher/distributor has the burden of establishing to the satisfaction of the DPCA [Directorate of Personnel and Community Activities] that its distribution is in conformity with the above requirements, and must receive written authorization to distribute.

informed Swarner of the new regulation. It also told him that all publishers must obtain written permission by December 15 for distribution on the post or risk being removed as unauthorized.

Swarner asked permission to distribute *The Ranger* "coextensively with the distribution granted to all other commercial newspapers, fliers, magazines, etc. distributed on Fort Lewis." He also sought permission to distribute in residential areas as a subscription publication. His request provided no information showing that *The Ranger* was a paid subscription publication as defined by the new regulation.[6]

In a December 15 letter, the Army denied Ranger permission to continue door-to-door, residential delivery.[7] It granted permission to distribute *The Ranger* from stands and racks at 25 specific locations in the general use areas of Fort Lewis. These distribution limitations treated *The Ranger* as a gratuitous, nongovernment publication rather than as a paid subscription newspaper.

In March 1990, the district court heard cross-motions for summary judgment on the issues of distribution and access to information. All parties agreed that no material issues of fact existed. The judge granted Ranger's motion and asked its counsel to draft findings of fact and conclusions of law. In entering the judgment, he retained jurisdiction to assure the Army's compliance with his conclusions of law.

In May 1990, Ranger moved the court to exercise its retained jurisdiction. Following a hearing, the court directed the Army to give Ranger news and information in the same way and the same format as it gave

such material to the new CEN. The Army filed a timely notice of appeal.

## STANDARD OF REVIEW

■ We review de novo a summary judgment. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986). Where the facts are not disputed, the question is whether the district court correctly interpreted and applied the law. *Id.*

■ The findings of fact in a district court's order of summary judgment are not protected by the deferential clear-error standard of review. Their limited purpose is to pinpoint the undisputed facts supporting the summary judgment, not to weigh the evidence in the record. *Heiniger v. City of Phoenix,* 625 F.2d 842, 843–44 (9th Cir.1980). Where such findings are drafted by the prevailing party's counsel and adopted verbatim by the district court, it may be appropriate to "scrutinize them with greater than usual care." *Id.* at 844 n. 4.

## DISCUSSION

I. Restriction of *The Ranger*'s Distribution

We consider first whether the district court properly granted summary judgment for Ranger on its distribution claim. The court concluded that the Army impermissibly discriminated against Ranger by not allowing it to distribute door-to-door in residential areas of Fort Lewis. It found that the new local regulation served "no legitimate military interest."

■ The parties agree that Fort Lewis is a nonpublic forum. *See Cornelius v.*

Fort Lewis Supplement 1 to Army Regulation 210–7, Change No. 3 (Nov. 22, 1989).

**6.** A December 19, 1989 declaration by Swarner characterizes *The Ranger* as a subscription newspaper, with the subscriptions "paid for by various businesses who desire to insure continued delivery to the Fort Lewis readership." It notes that "[o]nly two housing units have declined this subscription service to date," and that "five residents of five different family housing units on Fort Lewis have paid to subscribe to The Ranger." Fort Lewis has some 3,500 family homes.

**7.** The district court's findings of fact state that the "Army even denied The Ranger permission to distribute to the five subscribers who qualified as paid subscribers under the newly promulgated local supplement." In this court, the Army concedes that the five Fort Lewis residents who requested and paid for subscriptions to *The Ranger* may have their papers delivered to their homes. It appears to have made the same concession in the district court.

*NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 804, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985)(military reservations are generally not public fora). In nonpublic fora, the government's authority to limit speech reaches its apex. *See M.N.C. of Hinesville v. United States Dep't of Defense,* 791 F.2d 1466, 1473–74 (11th Cir. 1986). The government "may reserve the [nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's views." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

### A. Was the Distribution Restriction Reasonable?

■ To defend the reasonableness of its restriction on *The Ranger*'s distribution, the Army focuses on the nature and purpose of the CEN program. It argues its actions were reasonable because the CEN must have a preferred distribution status compared to other free newspapers to accomplish the program's objectives.

The Fourth Circuit accepted this argument in *Shopco Distrib. Co. v. Commanding Gen.,* 885 F.2d 167 (4th Cir.1989), *reh'g denied,* 1989 WL 104360, 1989 U.S.App. LEXIS 17908, which involved Camp Lejeune's ban on door-to-door distribution of nonsubscription newspapers other than the CEN. The court held the ban reasonable, largely because of the crucial economic incentive that exclusive distribution rights give to the CEN publisher. *Id.* at 174. It relied heavily on a similar case, *M.N.C. of Hinesville, Inc. v. United States Dept. of Defense,* 791 F.2d 1466 (11th Cir.1986).

In *M.N.C. of Hinesville,* the Eleventh Circuit held the preferential distribution of a CEN reasonable in view of the CEN's special function and purpose. *Id.* at 1476–77. It recognized that "[t]he military has an interest in distributing to its personnel material that is not otherwise readily available," whether crucial to national security or not, and in getting them to read it. *Id.*

at 1476. The CEN "furthers a sense of community on the base" and "enhances the quality of life" there, while furthering the Army's interest in disseminating its material at no taxpayer cost. *Id.*

*Shopco* and *M.N.C. of Hinesville* convince us that the preferential distribution rights afforded by Fort Lewis to its CEN are generally reasonable. The only issue of reasonableness that these cases do not answer is whether Fort Lewis officials imposed an unreasonable restriction on speech when they issued a new local regulation defining "paid subscription."

■ Heightened scrutiny does not apply in a nonpublic forum; the government need not adopt "the *most* reasonable or the *only* reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452 (emphasis added). The existence of alternative communication channels, the avoidance of disruptions and administrative manageability are all relevant to a restriction's reasonableness. *See id.* at 809–10, 105 S.Ct. at 3452–53.

We find the Fort Lewis supplement to Army Regulation 210–7 reasonable and reject the district court's conclusion that it served no legitimate military interest. The regulation avoids the disruption of post housing that could result if free publications engaged in door-to-door distributions. *Cf. Cornelius,* 473 U.S. at 810, 105 S.Ct. at 3453 (stating that "the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum"). Moreover, the regulation fulfills this legitimate interest while leaving *The Ranger* with alternative communicative means. Ranger may distribute its paper at the doors of bona fide paid subscribers, in the identified common areas, and by mail. *See supra* nn. 5, 7.

We reject Ranger's assertion that it is a "paid subscription" and that subscriptions had been given to post residents as gifts. The Army concedes that the five post residents who pay for *The Ranger* may have it delivered to their homes. The Army was reasonable in determining that the remaining deliveries of *The Ranger* were not pur-

suant to paid subscriptions and thus violated the regulation.

### B. Was the Distribution Restriction Unlawful Viewpoint–Based Discrimination?

■ The district court concluded that the Army singled Ranger out for discriminatory treatment, intentionally using the new local regulation to prevent *The Ranger*'s distribution as a paid subscription newspaper. The court never identified the Army's reason for discriminating against Ranger or explicitly stated that it was unlawful to discriminate on this basis.[8]

■ Access to a nonpublic forum may be controlled based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451. Drafting the new local regulation with Ranger in mind does not necessarily constitute viewpoint-based discrimination.

■ On its face, the new regulation is content-neutral. Yet "facially neutral and valid justifications for exclusion from the nonpublic forum ... [may nonetheless] conceal a bias against the viewpoint advanced by the excluded speakers." *Cornelius*, 473 U.S. at 812, 105 S.Ct. at 3454. Where a facially neutral restriction is *"in fact* based on the desire to suppress a particular point of view" the restriction is pretextual and invalid. *Id.* (emphasis added).

Ranger defends the finding of unlawful discrimination, arguing that the factual context shows the Army systematically attempted to eliminate it as a competitor to

the CEN. Ranger contends that "[n]o other subscription newspaper was affected" by the new local regulation.[9] It emphasizes that after it lost the CEN contract the Army initially denied it all distribution on post. It notes the district court's unchallenged holdings that the Army violated its regulations in selecting Robinson and improperly asserted ownership of *The Ranger*'s name.

The evidence in this record cannot support the legal conclusion that the Army discriminated against Ranger because of its views. Nothing in this record links the distribution restriction to any editorial policy of Ranger. The evidence instead suggests that the restriction of Ranger's distribution flowed from the change in Ranger's status.[10] As we have indicated, the Army may offer its CENs a preferred status.

Ranger's position is reduced to the implausible argument that after it served nearly four decades as the preferred channel of communications for the Fort Lewis command, that same command inexplicably began discriminating against it on the basis of its views. In drawing inferences from the facts on summary judgment, the court must favor the nonmoving party.[11] Yet even on summary judgment the court may decline to draw an implausible inference from ambiguous circumstantial evidence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 596–97, 106 S.Ct. 1348, 1356–57, 1361–62, 89 L.Ed.2d 538 (1986).

The material, undisputed facts of record are insufficient to establish viewpoint-based discrimination as a matter of law. The Army did not violate the first amend-

---

**8.** At the hearing on summary judgment, the district judge indicated that he did not know what motivated the discrimination he found. He said he was convinced "that for some reason the commanding general at Fort Lewis doesn't want the Plaintiff on that post," and had targeted Ranger with the new local regulation.

**9.** The record before us does not show whether the new regulation affected other newspapers. At the summary judgment hearing, the Army's counsel represented that the practice of at least one paid subscription newspaper conformed to the regulation.

**10.** For example, an uncontradicted declaration by the commanding general states that he changed the local regulation because he desired a uniform policy that would treat like publications in a like manner.

**11.** This appeal encompasses both the granting of Ranger's motion for summary judgment and the denial of the Army's cross-motion. Ranger is not entitled to the benefit of the inferences as to its own motion, but the opposite is true as to the Army's motion.

ment by its regulation restricting Ranger's access to the nonpublic forum of the post. We hold that the district court erred in granting Ranger's summary judgment motion and in denying the Army's.

## II. Ranger's Access to Army News and Information

■ The court also held that the Army's regulations required it to provide Ranger with internal news and information that might be used as CEN editorial content prior to the CEN's publication. The findings of fact cite three regulations: 32 C.F.R. § 202.11(a)(1),[12] 32 C.F.R. § 297.5(a)(2)[13] and DoD Directive 5400.7–R.[14] The Army contends the court erred in relying on a regulation in part 202, which was superseded in 1985 when part 297 was promulgated. *See* 55 Fed.Reg. 24557 (1990) ("32 CFR is amended by removing part 202, which was rendered obsolete with the publication of part 297").

Although part 202 remained on the books until June 18, 1990, part 297 explicitly states that it "updates policy, procedures, and responsibilities concerning DoD newspapers and civilian enterprise (CE) publications." 32 C.F.R. § 297.1 (1989). During the interim when the Code of Federal Regulations contained both parts, the Fourth Circuit recognized the superseding effect of part 297. *Shopco*, 885 F.2d at 169 n. 2;

*accord* 55 Fed.Reg. 24557, 24557 (1990)(part 297 represented "a fundamental shift in policy concerning CE newspapers").

Again we find *Shopco* persuasive and think the district court misplaced its reliance upon part 202.[15] Even if the court were correct, however, the later repeal of part 202 precludes us from further relying on it to decide this case. *See Thorpe v. Housing Auth.*, 393 U.S. 268, 281–82, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969)(general rule that an appellate court must apply the law in effect at the time of its decision extends to administrative regulations). We must consider what requirements the current regulations impose on the Army.

Part 297 "guarantees [the CEN] first publication and distribution of the editorial content in the publication." 32 C.F.R. Part 297, App. B, ¶ F.1. (1990). This part established "the right of the CE newspaper to first use of editorial content." 55 Fed.Reg. 24557, 24557 (1990).

Ranger cites 32 C.F.R. § 297.5(a)(2) and Department of Defense Directive 5400.7–R. Section 297.5(a)(2) permits access, upon request, to specific "internal information content ... prepared for publication in DoD newspapers ... under DoD Directive 5400.7 and DoD 5400.7–R." 32 C.F.R. § 297.5(a)(2) (1990). Directive 5400.7–R, which helps implement the Freedom of In-

---

**12.** "All news or information of the Armed Services made available to a civilian enterprise publication *will be made available equally to any other publisher who requests it.*" 32 C.F.R. § 202.11(a)(1) (emphasis added), *repealed by* 55 Fed.Reg. 24557, 24558 (1990)(effective June 18, 1990).

**13.** "Specific items of internal information content of interest to DoD personnel and their dependents prepared for publication in DoD newspapers *may be made available to requesters under DoD Directive 5400.7 and DoD 5400.7–R.*" 32 C.F.R. § 297.5(a)(2) (emphasis added).

**14.** The pertinent portion reads:

In order that the public may have timely information concerning DoD activities, records requested through public information channels by news media representatives that would not be withheld if requested under FOIA *should be released upon request.* Prompt responses to requests for information

from news media representatives should be encouraged to eliminate the need for these requesters to invoke the provisions of the FOIA and thereby assist in providing timely information to the public.
DoD Directive 5400.7–R, ¶ 1–300 (July 1989)(emphasis added).

**15.** We are not persuaded by Ranger's argument that the district court did not rely upon part 202. Conclusion of Law 12 states that "Department of Defense regulations require Army to release internal news and information it provides to its civilian enterprise newspaper to any news media representative who requests such material." Of the three regulations cited by the district court, this language most closely resembles the language of the regulation from part 202. *See supra* nn. 12–14. The regulation from part 297 is phrased in permissive, not mandatory, terms. *See supra* n. 13. The DoD Directive makes no reference to civilian enterprise publications in describing access to internal information. *See supra* n. 14.

formation Act (FOIA), states that Army public affairs channels "should" comply with records requests from news media representatives, if the information requested would not be withheld under FOIA. DoD Directive 5400.7–R, ¶ 1–300 (July 1989). Its purpose is to prevent unnecessary FOIA requests "and thereby assist in providing timely information to the public." *Id.*

The regulatory "guarantee" must prevail over the hortatory and permissive terms of the regulations cited by Ranger. The district court required the Army to violate the guarantee by ordering it to "release the news and information of the Armed Forces to Swarner immediately, as soon as it is available to the current civilian enterprise newspapers." This order incorrectly interprets the governing law. The court should have rejected Ranger's motion for summary judgment and granted the Army's.

III.   The Army's Compliance with the Information–Access Order

Because we reverse the district court's treatment of the information-access issue, we need not analyze at length its disposition of Ranger's motion for compliance with the judgment. The entry of a summary judgment for the Army will moot any question of its compliance with the original, erroneous judgment.

## CONCLUSION

We reverse the summary judgment for Ranger and grant the Army's cross-motion. Ranger's first amendment rights were not violated by the restrictions on its distribution, which were reasonable and not viewpoint based. The district court erred by ordering the Army to release potential CEN editorial content to Ranger before publication of the CEN, because this violated the regulatory guarantee that the CEN will have first rights of publication and distribution.

REVERSED and REMANDED WITH INSTRUCTIONS to grant the Army's cross-motion for summary judgment as to

the distribution and information-access issues.