**HAITIAN REFUGEE CENTER,
INC., et al., Plaintiffs,**

v.

**James BAKER, III, Secretary of State,
Rear Admiral Robert Kramek and Admiral Kime, Commandants, United
States Coast Guard, Gene McNary,
Commissioner, Immigration and Naturalization Service, the United States
Department of Justice, Immigration
and Naturalization Service, and the
United States of America, Defendants.**

No. 91–2653–CIV.

United States District Court,
S.D. Florida.

Dec. 3, 1991.

Ira J. Kurzban, Kurzban, Kurzban & Weinger, Miami, Fla., for plaintiffs.

Dexter Lee, Asst. U.S. Atty., Miami, Fla., for defendants.

## ORDER GRANTING PRELIMINARY INJUNCTIVE RELIEF AND SUPPORTING MEMORANDUM OPINION

ATKINS, Senior District Judge.

THIS CAUSE comes before the court on the application of Haitian Refugee Center, Inc., ("HRC"), individual plaintiffs ("individual plaintiffs") (collectively "plaintiffs"), and class members for preliminary injunctive relief pursuant to Rule 65, Federal Rules of Civil Procedure.[1] The application asks the court to extend a Temporary Restraining Order prohibiting defendants from forcefully repatriating Haitians in their custody either until the merits of the underlying action are resolved or until defendants implement and follow procedural safeguards adequate to ensure that Haitians with bona fide claims of political persecution are not forcefully returned to Haiti. By this application, plaintiffs do *not* seek entry to this country; rather, they seek *only* the protection of procedures to ensure that they are not forcefully returned to a country where, on account of their political opinion, their life and liberty are threatened by a brutal and illegitimate military regime.

The court determines that plaintiffs are entitled to the requested injunctive relief for the following reasons, as set forth more fully below. First, plaintiffs have standing and have demonstrated a substantial likelihood of prevailing on the merits of two justiciable, judicially enforceable claims: HRC's right of association and counsel, which arises from the First Amendment to the United States Constitution; and the Haitians plaintiffs' right of non-refoulement, which arises under Article 33 of the 1967 United Nations Protocol Relating to the Status of Refugees. Second, plaintiffs have demonstrated a substantial threat that they will suffer irreparable, even fatal, injury if the injunction is not granted. Third, plaintiffs have shown that this threatened injury outweighs the potential harm an injunction would cause defendants. Finally, plaintiffs have shown that the injunction would not be adverse to the public interest.

### A. BACKGROUND

The facts most relevant to the present inquiry can be summarized as follows. In 1981, President Ronald Reagan formally found that the migration of aliens without visas to the United States was "a serious national problem detrimental to the interests of the United States." Proclamation No. 4865, 46 Fed.Reg. 48,107 (1981), *reprinted in* 8 U.S.C. § 1182 note at 993 (1982). Specifically, President Reagan noted that "[a] particularly difficult aspect of the problem [was] the continuing illegal migration by sea of large numbers of undocumented aliens into to the southeastern United States." *Id.* Invoking both his constitutional and statutory authority, he decided that "international cooperation to intercept vessels trafficking in illegal migrants [was] a necessary and proper means of insuring the effective enforcement of our [immigration] laws." *Id.*

To implement this stated policy, on September 29, 1981, President Reagan ordered

---

**1.** By separate order, the court earlier today granted the following motions of HRC: Motion for Leave to File Supplemental Pleading and Second Amended Complaint; and Motion to Maintain the Amended Complaint for Declaratory and Injunctive Relief as the Class Action on Behalf of Plaintiffs.

the Secretary of State to enter into "cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea." Exec.Order No. 12324, 46 Fed.Reg. 48,109 (1981), *reprinted in* 8 U.S.C. § 1182 note at 992–93 (1982). The President also ordered the Secretary of Transportation to instruct the Coast Guard to interdict undocumented-alien-carrying vessels of foreign nations with which the United States has a cooperative arrangement authorizing the United States to stop and board such vessels. *Id.* The Coast Guard was further directed to "return the vessel and its passengers to the country from which it came, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist." These actions were to be taken only *beyond* the territorial waters of the United States. *Id.*

Executive Order 12324 also addressed the unique situation of individuals who might qualify as political refugees, providing that "no person who is a [political] refugee will be returned without his [or her] consent." *See* 8 U.S.C. § 1101(a)(42) (defining political refugee as "any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of ... political opinion"). The Executive Order further ordered the Attorney General, in consultation with the Secretaries of State and Transportation, to take any steps necessary "to ensure the fair enforcement of our laws relating to immigration ... and the strict observance of our international obligations concerning those who genuinely flee persecution in their homeland." Exec.Order No. 12324, 46 Fed. Reg. at 48,110.

On September 23, 1981, Haiti and the United States entered into a cooperative arrangement to prevent the illegal migration of visaless aliens to the United States. Interdiction Agreement, Sept. 23, 1981,

United States–Haiti, T.I.A.S. No. 10241. The agreement provides, in relevant part, that United States authorities may board Haitian flag vessels on the high seas for the purpose of making certain inquiries relating to the condition and destination of the vessel and the status of those on board. If a violation of a United States law or an appropriate Haitian law is discovered, the vessel and its passengers may be returned to Haiti. The government of Haiti also formally agreed that Haitians returned to that country (with the exception of those organizing the illegal departures) would not be prosecuted for illegal departure. Finally, within this arrangement, as in the Executive Order, the potential political refugee was singled out for differential treatment. The agreement states that it is "understood that ... the United States does not intend to return to Haiti any Haitian migrants whom the United States authorities determine to qualify for refugee status." *Id.*

To effect the cooperative arrangement with Haiti, officers of the Immigration & Naturalization Service (INS) were assigned to Coast Guard vessels involved in interdiction operations. The INS also issued Guidelines to govern its conduct during interdiction engagements. The relevant portions of those Guidelines provide as follows:

### INS ROLE AND GUIDELINES FOR INTERDICTION AT SEA

The following directives are to be followed by INS employees assigned to Coast Guard vessels interdicting vessels at sea pursuant to Presidential Proclamation 4865, dated September 29, 1981, and Executive Order Number 12324, dated September 29, 1981.

GENERAL

* Due to the sensitive nature of this assignment, all INS employees will be under the direct supervision of INS Central Office Headquarters, Associate Commissioner, Examinations.

* The only function INS officers are responsible for is to ensure that the Unit-

ed States is in compliance with its obligations regarding actions toward refugees, including the necessity of being keenly attuned during any interdiction program to any evidence which may reflect an individual's well-founded fear of persecution by his or her country of origin for reasons of race, religion, nationality, membership within a particular social group or political opinion.

* The duties of INS employees assigned to United States Coast Guard vessels will be limited to matters related to the interview of persons on board with respect to documentation relating to entry to the United States and possible evidence of refugee status.

* Except for independent determinations with respect to documentation relating to entry into the United States and possible claims to refugee status, INS officers will be subject to maritime directives and rules made by the Commanding Officer of the United States Coast Guard vessel.

\* \* \* \* \* \*

BOARDING OF VESSELS

* All decisions relating to which vessels will be interdicted and in what manner vessels will be boarded will be made at the discretion of the Commanding Officer of the United States Coast Guard vessel.

* INS officers and interpreters will be members of each boarding party. INS employees will not be armed.

* All initial announcements to the master, crew, and passengers of a boarded vessel as to the purpose of boarding, separation of crew and passengers, and general procedures (including advice that the boarded vessel may be returned to Haiti) will be made by United States Coast Guard personnel at the time the vessel is first boarded.

INS OFFICER RESPONSIBILITIES

A. To the extent that it is, within the opinion of the Commanding Officer of the United States Coast Guard vessel, safe and practicable, each person aboard an interdicted vessel shall be spoken to by an INS officer, through an interpret-

er. A log record shall be maintained of each such person's name, date of birth, nationality, home town, all documents or evidence presented, and the reason for departure.

B. A copy of the log prepared by the INS officers shall be provided to the Commanding Officer of the Coast Guard vessel.

C. INS officers shall be constantly watchful for any indication (including bare claims) that a person or persons on board the interdicted vessel may qualify as refugees under the United Nations Convention and Protocol.

D. If there is any indication of possible qualification for refugee status by a person or persons on board an interdicted vessel, INS officers shall conduct individual interviews regarding such possible qualification.

E. Interviews regarding possible refugee status shall be conducted out of the hearing of other persons.

F. If necessary, INS officers will consult with Department of State officials, either on board, or via radio communications.

G. Individual records shall be made of all interviews regarding possible qualification for refugee status.

H. If the interview suggests that a legitimate claim to refugee status exists, the person involved shall be removed from the interdicted vessel, and his or her passage to the United States shall be arranged.

I. Individual record folders shall be prepared and maintained by INS officers in every case where a person is being sent on to the United States, and such record folder may be used to support such person's claim in the United States. (The individual folder shall contain a sworn statement by the applicants concerning the claim.)

\* \* \* \* \* \*

INS Role In and Guidelines For Interdiction at Sea, October 6, 1981 (Attached as Exhibit C to Memorandum in Support of Plaintiff's Application for a Temporary Re-

straining Order) [hereafter "Guidelines" or "INS Guidelines"].

In December of 1990, in Haiti's first fully democratic elections in over 200 years, Jean Bertrand Aristide was elected President. In September of 1991, after President Aristide was overthrown by brutal military leaders, thousands of Haitians began to escape by sea in boats, many unseaworthy. As a result, the United States Coast Guard began interdicting an increasing number of vessels carrying fleeing Haitians; to date, at least nineteen (19) such vessels have been intercepted and more than 5000 Haitians have been detained. In addition, apparently in light of the political violence occurring in Haiti, the Coast Guard temporarily discontinued the repatriation of the interdicted Haitians. However, on November 18, 1991, defendants announced they had begun the forced return of the interdicted Haitians.

## B. PROCEDURAL BACKGROUND

The following day, November 19, 1991, HRC[2] filed a Verified Complaint for Declaratory and Injunctive Relief, as well as an Application for Temporary Restraining Order (TRO), against the following defendants in their official capacities: JAMES BAKER, III, Secretary of State; REAR ADMIRAL ROBERT KRAMEK and ADMIRAL KIME, Commandants, United States Coast Guard; GENE McNARY, Commissioner, Immigration and Naturalization Service; THE UNITED STATES DEPARTMENT OF JUSTICE; THE IMMIGRATION AND NATURALIZATION SERVICE; and THE UNITED STATES OF AMERICA.

The relief sought by Application for TRO and Verified Complaint is essentially the same, i.e., that the court enjoin defendants from forcefully repatriating Haitians not identified as candidates for asylum until the implementation of procedures providing adequate protection to Haitians pursuing political asylum. The Application for TRO and Verified Complaint, as amended, allege that defendants' actions violate rights of HRC, the individual Haitian plaintiffs, and members of a class of interdicted Haitians. The rights asserted allegedly arise from the following sources: the first and fifth amendments to the United States Constitution; an Executive Order; guidelines promulgated pursuant to the Executive Order; the Refugee Act of 1980; the Immigration and Nationality Act; the Administrative Procedure Act; and rules of international law, including the protection against forcible return granted political refugees by the United Nations Protocol Relating to the Status of Refugees.

Following a nonadversarial hearing on the afternoon of November 19, 1991, The Honorable Donald L. Graham, United States District Judge for the Southern District of Florida, issued a TRO, which provided as follows:

> Defendants are precluded from continuing to repatriate Haitians currently on board U.S.-flagged vessels and Haitians currently being held on land under United States' control and at Guantanamo Bay, Cuba until further order, to maintain the *status quo*.

On November 20, 1991, defendants filed two motions challenging entry of this TRO: Motion to Vacate TRO or to Stay Such Order Pending Appeal; and Motion for Emergency Hearing and to Shorten Notice Time Pursuant to Rule 65(b). On November 21, 1991, this court entered an order denying defendants' motions and granting a Motion to Expedite Discovery filed by plaintiff. The order also set a preliminary injunction hearing on the TRO for November 27, 1991. Defendants took an immediate appeal of the order. In the early evening of November 21, the Eleventh Circuit Court of Appeals stayed the discovery por-

2. HRC is a non-profit membership corporation located in Miami, Florida. The HRC's purpose, as set forth in its Bylaws, is to promote the well-being of Haitian refugees through appropriate programs and activities, including legal representation of Haitian refugees. It has in the past brought lawsuits and procedures and practices of the Immigration and Naturalization Service (INS) in processing Haitian refugee applications and has been recognized by the INS as a source of legal counsel for indigent Haitians. The HRC's membership includes Haitian refugees seeking political asylum in the United States.

tion of the order. In the afternoon of November 22, the Eleventh Circuit lifted the stay and dismissed defendants' appeal of this court's denial of defendants' motions to vacate or stay and for emergency hearing.

On Sunday, November 24, 1991, the parties agreed to an accelerated discovery schedule and to an extension of the TRO to and through Tuesday, December 3, 1991. The court received legal briefing from the parties between Saturday, November 30 and Monday, December 2, 1991. On Monday, December 2, 1991, plaintiff filed motions seeking to amend the complaint. As noted earlier, those motions have been granted. The court heard oral argument on the relevant legal issues the evening of Monday, December 2. Following oral argument, the court asked the parties whether they would consent to extension of the TRO through Thursday, December 5, in order to give the court additional time to consider the weighty legal issues involved. Counsel for defendants refused.

### C. DISCUSSION

■ A party moving for a preliminary injunction must establish the following four elements: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of suffering irreparable injury in the absence of an injunction; (3) that the threatened injury to the moving party outweighs the potential harm an injunction would cause the opposing party; and (4) that the injunction would not be adverse to the public interest. *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555, 1561–62 (11th Cir.1989), *aff'd,* —— U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant carries the burden of establishing the four elements described above. *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983).

### 1. Likelihood of Success on Merits

We first consider whether plaintiffs have shown a substantial likelihood of prevailing on the merits of the underlying claims.

This consideration implicates the following questions: whether plaintiffs have legal standing to bring this action; whether the issues posed are justiciable; whether plaintiffs have any judicially enforceable rights; and whether these rights are being violated by defendants' actions. For the reasons that follow, we find that plaintiffs have demonstrated a substantial likelihood of the following: that they have standing; that their claims are justiciable; that at least two rights are judicially enforceable; and that these rights are being violated by defendants' actions.

#### a. Standing

Article III of the Constitution limits the judicial power of federal courts to the resolution of actual "cases" and "controversies." U.S. Const. Art. III, Sec. 2. In order to satisfy the requirements of article III, litigants must establish standing to challenge the action sought to be litigated in the lawsuit. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The Supreme Court has recognized that in addition to the constitutional requirements, the concept of standing encompasses certain prudential considerations. *Id.*

#### (1) Organizational Standing of HRC

#### (a) *Constitutional Requirements*

At a minimum, article III requires a party to " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Id.* at 472, 102 S.Ct. at 758 (citations omitted). We find a substantial likelihood that the injury alleged by HRC satisfies the constitutional requirements for standing.

#### (i) Injury

■ Plaintiff HRC claims that it has suffered the particularized injury of being denied access to a particular and identifiable group of individuals which it is mandated

to serve, and that its members have suffered the denial of their rights to assert particular claims. HRC also alleges that its organizational purpose has been thwarted because it has been unable to effectively provide assistance to the interdicted individuals claiming or desiring to apply for refugee status. Complaint at 14. Additionally, HRC claims that its first amendment right to meet, speak with and solicit its members in Guantanamo and on the Coast Guard cutters has been denied. Amendment to Complaint at 1.

HRC's injury is similar to that alleged in *Ukrainian–American Bar Association v. Baker,* 893 F.2d 1374 (D.C.Cir.1990). The Ukrainian–American Bar Association [UABA] asserted that the government's failure to provide them access to Soviet and East Bloc aliens seeking asylum in the United States, which prevented them from counseling such persons regarding their rights, infringed upon their first amendment rights and hampered their pursuit of their political agenda. *Id.* at 1378. The court found that the UABA's claim alleged a "demonstrable, particularized injury." *Id.* (citing *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975)). Denying the UABA the opportunity to communicate their particular message to a uniquely relevant audience resulted in a "personal and concrete" injury. *Id.* (citing *Kurtz v. Baker,* 829 F.2d 1133, 1142 (D.C.Cir.1987)). The United States Supreme Court has also found that the frustration of a plaintiff organization's efforts to fulfill its purpose through activities such as counseling and referral constituted injury in fact. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). Similarly, we find a substantial likelihood that denying HRC the opportunity to meet, speak with and solicit its members results in personal and concrete harm to HRC.

HRC is injured directly in that its organizational purpose is thwarted by the defendants' alleged violations. In addition, it is injured indirectly through the adverse effect on its members. *See Haitian Refugee Center v. Nelson,* 694 F.Supp. 864, 875 (S.D.Fla.), *aff'd,* 872 F.2d 1555 (11th Cir.

1989), *aff'd sub nom. McNary v. Haitian Refugee Center,* —— U.S. ——, 111 S.Ct. 888, 894 n. 8, 112 L.Ed.2d 1005 (1991) (finding organizational standing where HRC suffered direct and indirect injury). Thus, HRC's claim falls into the category of cases exemplified by *NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963), in which the Supreme Court recognized standing based on alleged activities that injure both the association and its members. *See* 13 Wright, Miller & Cooper, Federal Practice & Procedure, Jurisdiction § 3531.9, at 608 (2d ed. 1984) (discussing *NAACP v. Button*). In *NAACP v. Button,* the Court held that a state law prohibiting solicitation of legal business abridged the first amendment right of the NAACP, its members and lawyers to associate for the purpose of furthering civil rights objectives. 371 U.S. at 428–29, 83 S.Ct. at 335. The Court found that NAACP had standing to assert this right on its on behalf and that it had standing to assert the corresponding rights of its members. *Id.* at 428, 83 S.Ct. at 335.

As in *Ukrainian–American Bar Association,* the denial of access to this particular group of Haitian refugees and HRC's corresponding inability to fulfill its organizational mandate distinguish its injury from an " 'abstract social interest' that is insufficient to confer standing." 893 F.2d at 1378 (citation omitted). Contrary to the defendants' contention, the injury alleged by HRC differs from the abstract allegations in *Haitian Refugee Center v. Gracey,* where the appellants did not assert that they knew or knew of any of the interdicted Haitians with whom they wished to associate. 809 F.2d 794, 800 (D.C.Cir.1987). In this case, there is an identifiable group of Haitian refugees with whom HRC is unable to communicate or associate due to the government's alleged violations of international and domestic law.

Also, in contrast to *Gracey,* where the court noted that HRC, "rather curiously, [did] not make the claim that the interdiction program violate[d] their first amendment rights," HRC has made such a claim in this case. Not only has HRC alleged the

violation of its first amendment rights, it has made that claim with respect to a specific group of individuals. Consequently, we find "substantial likelihood that HRC has alleged a 'particularized, demonstrable injury,'" *Warth v. Seldin*, 422 U.S. at 490, 95 S.Ct. at 2197, and furthermore, that HRC has standing on the basis of a legal right which it claims has been violated. *See Gracey*, 809 F.2d at 800.

(ii) Traceability and Redressability

■ In addition to injury in fact, article III requires that the alleged injury fairly can be traced to actions taken pursuant to the interdiction program and that the injury is likely to be redressed by a favorable decision. *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758. HRC has established both traceability and redressability. "To the extent that there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984).

The defendants argue that HRC raises the same allegations that it raised in *Gracey*, where it failed to establish standing due to a lack of causality. In *Gracey*, Judge Bork discussed the unlikelihood of a finding of a causal relationship where the causal chain involves a prediction about the independent actions of third parties. 809 F.2d at 805.[3]

However, unlike *Gracey*, this case does not involve a "prediction about independent actions of third parties." Rather, HRC

claims that the defendants' failure to comply with its domestic and international obligations affects HRC's *own* actions. Like the plaintiffs in *Ukrainian–American Bar Association*, HRC asserts a violation of its own claimed constitutional right to contact and to offer counsel to its members. 893 F.2d at 1379. Judge Ginsburg, in commenting on the organizational plaintiff's first amendment challenge, stated that

the right to speak protected by the first amendment is not, however, a right to be heeded; it is abridged even when speech that we may think would not make a mark in the marketplace of ideas is denied the opportunity to compete for acceptance. We may not, by denying standing under the rubric of causation, narrow the protection afforded by the first amendment.

*Id.* at 1379–80. Based on this reasoning, we conclude there is a substantial likelihood that HRC has a first amendment right which exists regardless of the actions of any third party with whom it seeks to communicate or associate.

Also, in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), the Supreme Court considered the claim that the government's refusal to admit Ernest E. Mandel, an advocate of communism, to the United States violated the first amendment rights of the United States citizens who had invited him to speak. Although the issue of standing was not addressed, "it may be assumed that [this allegation] satisfied the article III requirement of a distinct and palpable, not abstract or conjectural or hypothetical, injury." *Gra-*

---

**3.** Defendants' argument appears to draw from the following formulation of causation advanced by Judge Bork:

[There is] a heavy presumption that causation is too speculative if injury or redress depends upon the independent action of a third party not before the court, a presumption that in the absence of a legal prohibition can be overcome by *both* a demonstration that the purpose of the law or governmental action was to prevent the relationship between the litigant and the third party *and* a convincing demonstration of a "substantial probability" that the third party would otherwise have entered into the alleged relationship with the litigant.

*Gracey*, 809 F.2d at 805. Judge Bork concluded that even the existence of an official INS referral policy was not sufficient to show causation because the "interdiction program was not designed to interfere with HRC's counseling of Haitian refugees." *Id.* at 807.

Because Judge Bork's formulation appears to state a new rule of causation that is not supported by any of the Supreme Court cases addressing the issue, we do not follow it here. For a well-reasoned criticism of Judge Bork's approach, see Kahaner, *Separation of Powers and the Standing Doctrine: the Unwarranted Use of Judicial Restraint*, 56 Geo.Wash.L.Rev. 1074, 1087 (1988).

*cey*, 809 F.2d at 800. Similarly, HRC's allegation that the government's actions have resulted in the violation of its first amendment rights may be assumed to have satisfied the article III requirement of a "distinct and palpable" injury.

The defendants argue that it is speculative to presume that prohibiting the refugees' return to Haiti and ordering different procedures would lead to an increase in the number of Haitians associating with HRC. A similar argument was made in *Gracey*, 809 F.2d at 807. Again, however, the allegations in *Gracey* were different than those raised by HRC in this case. Instead of generally alleging that absent the interdiction program some refugees would have dealt with it, HRC has alleged that the government's conduct has resulted in a denial of HRC's access to an identified group of Haitian refugees. As discussed above, there is no speculation about the actions of unidentified refugees in this case. The causal link exists between the government's action and HRC's own alleged injury of being denied access to these refugees. Thus, the causal connection is not dependent on the actions of unidentified third parties, but on HRC's decision to act, which is far from speculative. *See Allen v. Wright*, 468 U.S. at 759, 104 S.Ct. at 3328.

HRC's inability to reach the identifiable group of Haitians is directly traceable to the government's alleged wrongful interdiction of those individuals. Furthermore, that injury would be redressed by a decision in HRC's favor. It does not require speculation to find that the government's alleged violations result in the frustration of HRC's ability to reach its members, causing injury by thwarting HRC's ability to promote the well-being of Haitian refugees attempting to enter the United States. Nor does it take conjecture to find that the relief requested would redress the injury by allowing HRC access to the refugees.

(b) *Prudential Considerations*

■ In addition to the article III requirements, standing doctrine embraces certain prudential considerations: (1) the general prohibition on a litigant's raising another person's legal rights; (2) the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches; and (3) the requirement that the plaintiff's complaint fall within the zone of interests protected by the law invoked. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The government challenges HRC's standing on the basis of the first and third considerations.

■ At the outset, we note that the United States Supreme Court has stated that "[w]ithin the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984). Because HRC has alleged the violation of a first amendment right, we believe that prudential considerations should be given less weight in determining whether HRC has established standing. Nevertheless, we address the government's challenges on prudential grounds in turn.

(i) Third party standing

(a) *HRC's assertion of its own rights*

This is not a case of an organization attempting to achieve standing by relying solely upon the rights of third parties. Nor is it a case of an association bringing suit only on behalf of its members. Rather, HRC has an injury in its own right. As Justice Powell observed in *Warth v. Seldin*, "in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its associational ties." 422 U.S. at 511, 95 S.Ct. at 2211. The defendants' alleged violations clearly have an adverse effect on HRC's associational ties.

Organizational plaintiffs have been accorded standing based on the assertion of their own rights in a number of cases. For example, in the leading case of *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), an organization promoting racially integrated

housing established standing by alleging that the defendants' racial steering practices frustrated its efforts to assist equal access to housing through counseling and other referral services. In *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 937–38 (D.C.Cir.1986), the court found that the counseling organization had standing based on its own right where it alleged that its operations were inhibited by the Department of Health and Human Services' implementation of the Age Discrimination in Employment Act of 1967. The Eleventh Circuit addressed the issue in *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555 (11th Cir.1989), *aff'd sub nom. McNary v. Haitian Refugee Center, Inc.,* ⸺ U.S. ⸺, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), and acknowledged that HRC had standing to challenge INS practices in its own right as opposed to on a third party theory. *Id.* at 1561 n. 10. As in *Havens Realty, Action Alliance,* and *HRC v. Nelson,* HRC has demonstrated a substantial likelihood that it has standing based on its own right.

#### (b) *Assertion of third party rights*

We also find a substantial likelihood that HRC has standing to assert the interests of the interdicted Haitians.[4] The Supreme Court has recognized that certain competing concerns may outweigh any prudential rationale against third party standing and therefore that there's a relaxed prudential standing limitation when such concerns are present. *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984) (citing *Craig v. Boren,* 429 U.S. 190, 193–94, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976)).

> Where practical obstacles prevent a party from asserting rights on behalf of itself, for example, the Court has recognized the doctrine of jus tertii standing. In such a situation, the Court considers whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected to properly frame the issues and present them with the necessary adversarial zeal.

*Id.*

█ HRC has demonstrated a substantial likelihood of the existence of all of the requirements for jus tertii standing. First, there are a number of practical obstacles that prevent the Haitian refugees' assertion of their rights. Second, HRC has alleged sufficient injury in fact. And third, HRC can reasonably be expected to properly frame the issues and to advocate the interdictees' interests zealously, as it has in the past.

Courts have also found third party standing appropriate when a special relationship exists between the plaintiff and the third party whose rights are allegedly infringed. *See, e.g., Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–34, 31 L.Ed.2d 349 (1972) (holding that defendant charged with giving away contraceptives could raise rights of those who wanted to use them). *See generally,* Monoghan, *Third Party Standing,* 84 Colum.L.Rev. 277 (1984). For example, in *Craig v. Boren,* the relationship of a beer vendor and a potential customer was sufficient for the vendor to raise the rights of the potential customers to challenge a prohibition of selling beer to minors on the grounds of gender-based discrimination. 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). In *Barrows v. Jackson,* the relationship between a minority and one who acted to protect the rights of the minority was sufficient to confer jus tertii standing. *Eisenstadt v. Baird,* 405 U.S. at 445, 92 S.Ct. at 1034 (discussing *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)). Note that the relationship may be between the litigant

---

**4.** We note that there is a difference, albeit a subtle one, between asserting the rights of a third party and an association suing on behalf of its members. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Because we find that HRC has standing in its own right and standing to assert the interests of its members, we do not reach the question of whether it satisfies the associational standing test set forth in *Hunt.*

and a *potential* third party. *Craig v. Boren*, 429 U.S. at 194, 97 S.Ct. at 455.

In contrast to the cases discussed above, the Supreme Court refused to allow plaintiff banks to strengthen their own claims by asserting the rights of their depositors in challenging federal recordkeeping and reporting requirements. *See California Bankers Assoc. v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). The Court held that the requirements did not violate the banks' rights, stating that "[w]hatever wrong such a result might work on a depositor, it works no injury on his bank." *Id.* at 51, 94 S.Ct. at 1512. The Court did note that although under other circumstances the bank might rely on the injury to its depositors, the Court did not need to reach that question because any claim the depositors might have was premature. *Id.* (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)).

*California Bankers* is distinguishable from the present case for two reasons. First, the wrongs which affect the interdicted Haitians do work injury on the HRC by frustrating its efforts to assist the refugees.[5] Second, any claims the interdictees have based on the alleged violations of the Protocol are not premature.

As in *Barrows, Eisenstadt,* and *Craig,* there is a special relationship between HRC and the Haitian plaintiffs that is sufficient to confer jus tertii standing. Unlike *California Bankers,* the alleged wrongs suffered by the Haitian refugees do result in injury to the HRC. Where "the same activity injures both the interests of the organization as such and related interests of its members, it is a natural extension to rule that the organization can assert the rights

of its members." 13 Wright, Miller & Cooper, Federal Practice & Procedure, Jurisdiction § 3531.9, at 608. Therefore, in bringing this suit, HRC may properly rely not only upon its own rights, but may also assert the interests of the interdicted Haitians. In fact, it may be impossible to decide HRC's claims without considering the interests of the Haitians. *See id.* at 554.

(ii) Zone of interests

The defendants also argue that HRC's interests in counseling and representing the interdicted Haitians are outside the "zone of interests" of the laws cited by HRC, which do not regulate or protect the right of an organization to associate with aliens interdicted on the high seas. The zone of interests test asks whether the interests advanced by the plaintiff are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

■ HRC's interests are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." HRC's interest in having access to the interdicted Haitians is clearly within the zone of interests to be protected by the First Amendment. *In re Primus*, 436 U.S. 412, 422–24, 98 S.Ct. 1893, 1899–1900, 56 L.Ed.2d 417 (1978); *NAACP v. Button*, 371 U.S. 415, 428–29, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963); *Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 531–32 (S.D.Fla.1980).

Also, the legislative history of the Refugee Act of 1980 is replete with references to the interests of voluntary and nonprofit agencies such as HRC in the refugee ad-

---

**5.** The Supreme Court has recognized third party standing much more readily where the litigant asserts its own rights and alleges injuries to itself. *See e.g., Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978), where the Supreme Court held that standing existed despite the fact that the litigant's claim implicated the rights of third parties:

 Where a party champions his own rights and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met. *Id.* at 80–81, 98 S.Ct. at 2634. HRC champions its own rights in this litigation and, as discussed above, it has satisfied all of the constitutional requisites for standing.

mission process. For example, the following statement in the House Report highlights the importance of the role that Congress envisioned for agencies like HRC in implementing the Refugee Act:

> Refugee resettlement in this country has traditionally been carried out by private voluntary resettlement agencies.... The Congress recognizes that these agencies are vital to successful refugee resettlement.

H.R.Rep. No. 608, 96th Cong., 1st Sess. 6 (1979) U.S.Code Cong. & Admin.News 1980, p. 141 [hereinafter "House Report"]. A comment by Representative Holtzman also was indicative of the legislature's intent to involve the interests of voluntary agencies:

> If this legislation is enacted, for the first time there will be some predictability to our Government's response to refugee problems that exist around the world. The Congress, the executive branch, and the voluntary agencies, will as a result be able to engage in long-term planning.

*Refugee Act of 1979: Hearings on H. 2816 Before the Subcomm. on Immigration, Refugees, and International Law on the Judiciary of the House of Representatives,* 96th Cong., 1st Sess. 1 (1979).

The legislative history of the United States' adherence to the United Nations Protocol on the Status of Regulations confirms a contemplation of the interests of voluntary agencies like HRC:

> The American Council of Voluntary Agencies, embracing 43 agencies and representing all factions and all of the organizations which carry on work on behalf of the refugees and other needy people abroad, and which also serve as a liaison in developing support for their efforts in this country, has unanimously endorsed U.S. accession to the protocol; [They] have petitioned the government on several occasions to take all necessary steps with a view to securing U.S. accession to the protocol.... [On] behalf of the President and the Secretary of State, I would like to reiterate their earnest hope.

S.Exec.Rep. No. 14, 90th Cong., 2d Sess. Appendix at 5 (1968) (testimony of Mr. Lawrence A. Dawson, Acting Deputy Director, Office of Refugee and Migration Affairs, Dept. of State).

The explicit references to the importance of the voluntary agencies, their interests and their concerns, including their role in formulating the Refugee Act, appear throughout the legislative history in both the House and the Senate. *See* House Report and S.Rep. No. 256, 96th Cong., 1st Sess. 7–8 (1979), U.S.Code Cong. & Admin.News 1980, p. 141. Based on the legislative history, we are convinced there is a substantial likelihood that, in addition to falling within the zone of interests of the First Amendment, HRC's interests fall within the zone of interests of the provisions at issue in this case.

Finally, the Supreme Court has recently held that the zone of interest test "is not meant to be especially demanding; in particular there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Securities Industry Association,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). The Court further stated that the zone of interests test "denies the right of review if the plaintiffs' interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit suit." *Id.* at 399, 107 S.Ct. at 757. As discussed above, HRC's interests are far from marginally related or inconsistent with the laws in question.

(2) Standing of Individual Plaintiffs

■ Plaintiffs contend that the interdiction program violates Article 33 of the United Nations Protocol Relating to the Status of Refugees. Because we find, as discussed below, that there is a substantial likelihood that the United States has violated international law, we also find that the individual plaintiffs have standing.

The individuals have satisfied the constitutional requirements of standing. They have demonstrated that they personally have suffered some actual or threatened injury as a result of the defendants' alleged

wrongful conduct. *Valley Forge,* 454 U.S. at 471, 102 S.Ct. at 757. The injury alleged is the wrongful forced return of these individuals, without the opportunity to meaningfully assert their claims for asylum, to a country where they may face persecution, detention or death. The injury " 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Id.* at 472, 102 S.Ct. at 758 (citations omitted).

In addition, the individual plaintiffs' claims present no prudential concerns. They bring suit in their own right, not on behalf of third parties. Moreover, the individual plaintiffs are clearly within the zone of interests protected by the Protocol.

### b. Justiciability

■ Having found a substantial likelihood of standing, we consider the difficult question of whether judicial review of HRC's claims is barred by the "murky and unsettled" political question doctrine. *See Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 803 n. 8 (D.C.Cir.1984) (Bork, J., concurring) (stating "[t]hat the contours of the doctrine are murky and unsettled is shown by the lack of consensus about its meaning among the members of the Supreme Court"). Generally speaking, a cause of action is nonjusticiable if it is "unsuited to judicial inquiry or adjustment" because it presents a "political question" by involving "the relationship between the judiciary and the coordinate branches of the Federal Government" in such a way as to implicate the doctrine of "the separation of powers." *Baker v. Carr,* 369 U.S. 186, 196, 210, 82 S.Ct. 691, 699, 706, 7 L.Ed.2d 663 (1962). Defendants argue that the issues raised by plaintiffs present political questions because of the constitutional commitment to the political branches of matters relating to immigration and foreign affairs, because there are no standards by which this court could judge the propriety of the actions being taken pursuant to the President's directive, and because the basic policy questions are not appropriate for judicial resolution.

We recognize that the execution of immigration and foreign affairs matters traditionally has been committed to the executive and legislative branches. *See Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (characterizing power to make immigration determinations as a "fundamental sovereign attribute exercised by the government's political departments largely immune from judicial control"). However, the fact that a controversy affects immigration or foreign policy does not of itself render the controversy nonjusticiable. *See Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706 (stating that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance"); *INS v. Chadha,* 462 U.S. 919, 942–44, 103 S.Ct. 2764, 2779–80, 77 L.Ed.2d 317 (1983) (declining to dismiss on political question ground challenge to congressional veto of INS order suspending plaintiff's deportation). Indeed, the Supreme Court has expressly left room for a "narrow standard of [judicial] review of decisions made by the Congress or the President in the area of immigration and naturalization." *Mathews v. Diaz,* 426 U.S. 67, 82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). An analysis of the present case shows a substantial likelihood that the claims presented are not exclusively committed for resolution to the executive branch. Unlike the claim in *Johnson v. Eisentrager,* 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950), for example, plaintiff does not seek to adjudicate the lawfulness of United States military presence abroad.[6] Properly understood, plaintiff's claims are narrowly focused on whether defendants' execution of the interdiction policy violates rights of plaintiffs arising under international law and the United States Constitution, statutes and guidelines.

---

**6.** In *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), the Supreme Court refused to adjudicate claims by enemy aliens who were convicted of violating laws of war in China after Germany had surrendered.

The Court found that resolution of the claims were committed to resolution by the political branches because the claims basically challenged the propriety of United States military action in China. *Id.* at 789, 70 S.Ct. at 949.

Resolution of the presented claims will not require this court to move outside of its areas of expertise. On the basis of the record developed, it appears that adjudication of this case will necessitate interpretation of the nature of the rights asserted and adjudication of the defendants' compliance with those rights. Regarding the government's conformity with its own rules and the other sources of rights presently asserted, we note that courts have found sufficient standards to assess such conformity. *See, e.g., Hotel and Rest. Emp. Union, Local 25 v. Smith,* 563 F.Supp. 157, 160 (D.C.D.C.1983). HRC does not challenge a determination left exclusively to executive discretion, but rather procedures utilized by the executive pursuant to its constitutional and statutory authority.

Moreover, to the extent that conditions in Haiti are relevant to the adjudication of the claims, we recognize that courts have made findings of fact about conditions in other countries when such determinations are relevant to deciding whether the policies and procedures of the INS violate the statutory or constitutional rights of aliens. *See, e.g., Coriolan v. INS,* 559 F.2d 993, 1002–03 (5th Cir.1977); *Haitian Refugee Center v. Civiletti,* 503 F.Supp. 442, 507–09 (S.D.Fla. 1980), *aff'd as modified, Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir. 1982); *Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 358 (C.D.Cal.1982) (taking judicial notice that El Salvador in midst of civil war, that continuing military actions created substantial civilian danger, and that government and guerilla forces responsible for political persecution). In short, it appears substantially likely that there is no "lack of judicially discoverable and manageable standards" to apply. *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706.

Finally, we find a substantial likelihood that the prudential considerations set out in *Baker v. Carr, supra,* do not bar adjudication of the claims.[7] For example, the claims presented do not call upon this court to make or review foreign policy determinations, nor do they challenge the facial validity of the interdiction program, *cf. Johnson,* 339 U.S. at 789, 70 S.Ct. at 949; *Dickson v. Ford,* 521 F.2d 234 (5th Cir.1975) (upholding dismissal as nonjusticiable question of taxpayer's challenge to military and economic assistance to Israel), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 360 (1976). The claims do not challenge the traditional power of Congress to control entry into the United States, seek a declaration of admissibility of any alien or request this court to declare the ultimate eligibility of specific aliens to asylum protection.

Instead, the claims call upon the court to decide whether the defendants' actions in carrying out the program violate U.S. and international law. As the United States Court of Appeals for the District of Columbia Circuit has recognized,

> The political question doctrine is a tempting refuge from the adjudication of difficult constitutional claims. Its shifting contours and uncertain underpinnings make it susceptible to indiscriminate and overbroad application to claims properly before the federal courts.... Despite confusion over whether a retreat to the political question doctrine is proper in particular cases, it is clear that the doctrine is, at best, a narrow one.

*Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1514 (D.C.Cir.1984). Accordingly, we find that plaintiffs have shown a substantial likelihood that the claims presented are justiciable and not barred by the political question doctrine.

#### c. Judicial Enforceability and Merits of Claims

Plaintiffs allege that defendants' actions in carrying out the interdiction program

---

7. These considerations are the following:
 [T]he impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; of an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710.

violate their rights and the rights of their class members. As sources of the alleged rights, plaintiffs advance the following: (1) Article 33 of the United Nations Protocol Relating to the Status of Refugees; (2) the first amendment to the United States Constitution; (3) the fifth amendment to the United States Constitution; (4) Executive Order 12324 and guidelines promulgated pursuant thereto; (5) the Refugee Act of 1980; (6) the Immigration and Nationality Act; and (7) the Administrative Procedures Act. Defendants contend that none of the alleged rights is judicially enforceable. We disagree and find that plaintiffs have demonstrated a substantial likelihood that the first amendment and Article 33 provide rights enforceable by this court. We also find a substantial likelihood that plaintiffs will otherwise prevail on the merits of their claims.

### (1) U.N. Protocol Relating to Status of Refugees

Plaintiffs contend that the interdiction program violates the 1967 United Nations Protocol Relating to the Status of Refugees (Protocol). The United States is a party to the Protocol, which incorporates Articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees.[8] 19 U.S.T. 6223; T.I.A.S. No. 2545. The Protocol defines a refugee as any person who, "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country."

Article 33 of the Convention, incorporated into the Protocol, provides as follows:

No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

**8.** For sake of clarity, the court will refer to the Convention Articles incorporated into the Proto-

Article 3 of the Convention, also incorporated into the Protocol, provides that the provisions of the Protocol are be applied "to refugees without discrimination as to race, religion or country of origin."

Plaintiffs claim that the defendants' actions in carrying out the interdiction program violate Article 33 by providing inadequate procedural safeguards to ensure that interdicted Haitians are not returned to Haiti where, on account of their political opinion, their life and liberty are threatened by a brutal and illegitimate military regime. Defendants deny they have a judicially enforceable non-refoulement obligation to the interdicted Haitians under the Protocol. First, defendants argue that the Protocol is not binding on the United States because the Protocol was not self-executing. Second, defendants argue that even if the Protocol were self-executing and therefore binding on the United States, the non-refoulement protections of Article 33 do not extend to Haitians interdicted in international waters. Although the question is a very close one, we determine that plaintiffs have shown a substantial likelihood that the Protocol was self-executing and that the protections of Article 33 extend to the Haitians interdicted on high seas.

### (a) *Self–Execution of Protocol*

 A treaty can become binding upon a party to the treaty in one of two ways. First, the treaty's provisions can be implemented by legislation enacted by the party state. Congress has implemented the Protocol, at least in part, through the Refugee Act of 1980. *See Bertrand v. Sava*, 684 F.2d 204, 218–19 (2d Cir.1982). However, as discussed below, the Refugee Act provides no rights to aliens outside of the United States. *See* 8 U.S.C. § 1158. Accordingly, to the extent the Protocol provides non-refoulement protection to aliens outside the United States, the provision of that protection has not been implemented by United States legislation.

col as Articles of the Protocol.

The second way a treaty's provisions can become binding upon a party is by self-execution. Self-executing provisions of a treaty become effective and binding upon the parties immediately upon ratification of the treaty. *See Cook v. United States*, 288 U.S. 102, 119, 53 S.Ct. 305, 311, 77 L.Ed. 641 (1933); *United States v. Postal*, 589 F.2d 862, 875 (5th Cir.1979). Opinions out of two Eleventh Circuit courts which appear to have considered whether the Protocol was self-executing support the proposition that it was and therefore is binding on the United States. *See Nicosia v. Wall*, 442 F.2d 1005, 1006 n. 4 (5th Cir.1971) (stating, without recognizing implementing legislation, that "Protocol *binds* acceding States to apply certain provisions of the 1951 Refugee Convention") (emphasis added); *Fernandez–Roque v. Smith*, 539 F.Supp. 925, 935 n. 25 (N.D.Ga.1982) (stating inclination toward view that Protocol is self-executing). Moreover, the United States Supreme Court has recognized that "[t]he Protocol *bound* parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees." *Immigration and Naturalization Service v. Stevic*, 467 U.S. 407, 416, 104 S.Ct. 2489, 2494, 81 L.Ed.2d 321 (1984) (emphasis added).

We also recognize that at least two courts have reached the contrary conclusion. *See Bertrand v. Sava*, 684 F.2d 204, 218–19 (2d Cir.1982) (holding that "the Protocol's provisions were not themselves a source of rights under our law unless and until Congress implemented them by appropriate legislation"); *Haitian Refugee Center, Inc. v. Gracey*, 600 F.Supp. 1396, 1403–04 (D.C.D.C.1985) (same), *aff'd on other grounds*, 809 F.2d 794 (D.C.Cir.1987). Nevertheless, in light of the following analysis, we find a substantial likelihood that the Protocol was self-executing and therefore binding upon the United States.

Because the Protocol itself contains no express declaration or denial of its self-executing nature, we must look elsewhere to determine whether or not the Protocol was self-executing, "one of the most confounding [questions] in treaty law," *Postal,* 589 F.2d at 876 (noting that "[t]heoretically a self-executing ... provision should be readily distinguishable" but that "[i]n practice it is difficult"); *see Haitian Refugee Center, Inc. v. Gracey,* 809 F.2d 794, 840 (D.C.Cir.1987) (Edwards, J., concurring) (describing question as "complex"). To do so, we must consider the parties' intent and the subject matter, legislative history and subsequent constructions of the treaty. *See Postal,* 589 F.2d at 876–77.

Due to the multilateral nature of the treaty, consideration of the parties' intent is least helpful. *See id.* at 878 (noting difficulty of determining common intent regarding self-execution of multilateral treaty). Because some parties, such as Great Britain, never recognize a treaty as self-executing, *see id.* at 878 n. 24, these parties lack any intent with respect to the direct application of the provision in their countries. Ascertaining intent of the multiple parties to the Protocol is made even more difficult by the fact that many countries "lack the equivalent of the Supremacy Clause." Iwasawa, The Doctrine of Self-Executing Treaties in the United States: A Critical Analysis, 26 Va.J.Int'l L. 627, 656 n. 122 (1986).

The subject matter of the Protocol supports the proposition that the non-refoulement provision is self-executing and therefore governing in the United States. The provision neither explicitly calls for legislation nor requires positive legislative action, such as the appropriation of money or the imposition of sanctions. The provision mandates neither material assistance nor expenditure of funds; therefore, it should operate of itself, without the aid of any legislation. *See Postal,* 589 F.2d at 877 (stating relevancy of such considerations); Note, Interdiction: The United States' Continuing Violation of International Law, 68 B.U.L.Rev. 773, 785 (1988) [hereinafter "Interdiction Note"]. The mandatory nature of the non-refoulement provision of the Protocol also supports a finding that it is self-executing. *See* Protocol, art. 7, para. 1 (prohibiting parties from excluding or modifying the non-refoulement provision); *see also Frolova v. U.S.S.R.,* 761 F.2d 370, 373

(7th Cir.1985) (stating that one factor bearing on whether treaty is self-executing is "the nature of the obligation imposed by the agreement" and that lack of legal obligation in treaty indicates non-self-executing nature of treaty).

The legislative history surrounding the Protocol further supports the conclusion that the non-refoulement provision is self executing. In a letter transmitting the Protocol to the Senate, President Lyndon Johnson expressed a belief that United States law already met the standards of the Protocol, suggesting that further implementation was unnecessary for incorporation of the Protocol into United States law. *See* 114 Cong.Rec. 27,757 (1968), *quoted in* Interdiction Note at 781–82. Noting the Protocol's provision of non-refoulement, President Johnson wrote that "accession to the Protocol would not impinge adversely upon established practices under existing laws in the United States." *Id.; see also* Cong.Research Serv., Library of Cong., 96th Cong., 1st Sess., Review of U.S. Refugee Resettlement Programs and Policies 14 (Comm.Print 1979) (stating that "[i]t should be remembered that during Senate consideration of the United Nations Protocol on Refugees in 1968, the Department of State noted that legislation was not required to implement the Protocol"), *reprinted in* Interdiction Note at 785–86.

Finally, it appears that the subsequent construction of the Protocol generally supports the conclusion that it was self-executing. As noted above, two courts have concluded that the treaty was not self-executing. *See Bertrand v. Sava,* 684 F.2d 204, 218–19 (2d Cir.1982); *Haitian Refugee Center, Inc. v. Gracey,* 600 F.Supp. 1396, 1403–04 (D.C.D.C.1985), *aff'd on other grounds,* 809 F.2d 794 (D.C.Cir.1987). However, several courts in addition to the ones already noted, *see Nicosia v. Wall,* 442 F.2d 1005, 1006 n. 4 (5th Cir.1971); *Fernandez–Roque v. Smith,* 539 F.Supp. 925, 935 n. 25 (N.D.Ga.1982), have concluded that the Protocol was self-executing. *See Sannon v. United States,* 427 F.Supp. 1270, 1274 (S.D.Fla.1977) (holding that Protocol established alien's right to hearings), *vacated and remanded on other grounds,*

566 F.2d 104 (5th Cir.1978); *Matter of Dunbar,* Interim Decision of Board of Immigration Appeals, No. 2192, 310 at 313 (April 17, 1973) (stating in regard to Protocol that "such a treaty, being self-executing, has the force and effect of an act of Congress").

In light of the foregoing, we determine that HRC has demonstrated a substantial likelihood that the Protocol's protection against refoulement was self-executing. Although the intent of the parties is unclear, the subject matter, legislative history and subsequent construction of the Protocol by United States courts support this determination. Accordingly, the Protocol is binding upon the United States. To hold otherwise might very well ignore the Constitutional mandate that treaties are the "supreme law of the land." U.S. Const. art. VI, cl. 2.

(b) *Protocol's Coverage of Haitians on High Seas*

Having concluded that the Protocol was self-executing and therefore that the United States is bound by Article 33's prohibition against refoulement of political refugees, we must determine whether the Haitians interdicted by defendants are entitled to that protection. Article 33 of the Convention, incorporated into the Protocol, provides as follows:

> No Contracting State shall *expel* or *return* ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

(emphasis added).

Based on our review of the caselaw, it appears that only one court has considered whether Haitians intercepted pursuant to the interdiction program are protected against refoulement. In *Haitian Refugee Center, Inc. v. Gracey,* 809 F.2d 794 (D.C.Cir.1987), Judge Harry Edwards determined in dicta that Article 33 "was not intended to govern parties' conduct outside of their national borders." *Id.* at 840 (Edwards, J., concurring). Judge Edwards

based his determination on a discussion among the parties to the treaty which suggested their agreement that "'expulsion' would refer to a 'refugee already admitted into a country' and that 'return' would refer to a 'refugee already within the territory but not yet resident there.'" *Id.* at 840 n. 133 (quoting discussion among parties at second and final reading of draft Convention). Because a Haitian interdicted in international waters is neither admitted into nor already within the United States, under Judge Edwards' interpretation such a person receives no benefit of Article 33's prohibition against refoulement.

▪ The question whether Article 33's non-refoulement obligation extends to the high seas is a close one. American commentators appear split on the question. *Compare* Note, The Rights of Asylum Under United States Law, 80 Col.L.Rev. 1125, 1126–27 (1980) (stating that Article 33 does not extend to refugees outside contracting country's borders) *with* Interdiction Note, 68 B.U.L.Rev. at 794 (1988) (stating that Article 33 does extend to refugees outside contracting country's borders). Once this court reaches the merits underlying this action, the court may determine, as did the *Gracey* court, that Article 33 provides no protection to the intercepted Haitians.

However, for several reasons we find a substantial likelihood that the interdicted Haitians are protected under Article 33 of the Protocol. Initially, we note that Judge Edward's determination in *Gracey* is dictum from a court outside this circuit. Moreover, Judge Edward's determination appears to ignore Article 32 of the Protocol, which

> requires an interpreting body to conclude that an ordinary meaning of the text is either obscure or unreasonable before it can look to 'supplementary means' [and] reflects reluctance to permit the use of materials constituting the development and negotiation of an agreement (Travaux Preparatoire) as a guide to interpretation of the agreement.

Rest.For.Rel. § 325, comment (e) (quoted in Plaintiff's Reply Memorandum in Support of Motion For Preliminary Injunctive Relief).

Second, the plain language of the Protocol manifests a purpose to provide liberal protection for those facing political persecution. Article 33 provides that "No Contracting State shall expel or *return* ("refouler") a refugee *in any manner whatsoever* to the frontiers of territories where his life or freedom would be threatened on account of his ... political opinion." (emphasis added). The present action asserts that defendants are refouling political refugees to Haiti in the manner of interdicting their boats and returning them to that violence-torn land without sufficient inquiry into their political asylum claims. As shown below, the limited evidence taken thus far supports HRC's claim. Notwithstanding the debate transcripts relied upon by the *Gracey* court to the contrary, it seems substantially unlikely that a Protocol designed to protect refugees fleeing bona fide political persecution could have been intended not to provide protection to the Haitians fleeing the brutal, military regime now in power on the ground that those fleeing had not yet reached the territory of a Party to the Protocol. Indeed, the United Nations High Commission for Refugees has stated that "according to the terms of Article 33, the principle of non-refoulement applies extraterritorially." Letter from Rene van Rooyen, Representative of United Nations High Commissioner for Refugees, to HRC Counsel (dated November 29, 1991).

Third, subsequent constructions by the United States support the notion that the interdicted Haitians are covered by Article 33 of the Protocol. Most importantly, Executive Order 12324 and the accompanying guidelines reflect an understanding by the United States that the prohibition against refoulement is binding and protects Haitians interdicted on the high seas. As noted above, Executive Order 12324, which sets forth the interdiction program, specifically provides that following the interdiction of a boat in international waters, "no person who is a refugee will be returned without his consent." Executive Order 12324 § 2(c)(3). The Executive Order also autho-

rizes the Attorney General to promulgate guidelines "to ensure the fair enforcement of our laws relating to immigration ... and the strict observance *of our international obligations concerning those who genuinely flee persecution in their homeland." Id.* § 3 (emphasis added). In light of this language, defendants' argument that Article 33 does not extend to international waters is curious, since Executive Order 12324 applies *only* to persons interdicted *in international waters. See id.* § 2(d) (authorizing interdiction program "only outside territorial waters of the United States").

The nature of the United States' subsequent construction is confirmed by the INS Guidelines promulgated in accordance with Executive Order 12324; the Guidelines evince the construction of Article 33 as binding with respect to Haitians interdicted in international waters. Indeed, the Guidelines, which have effect only in international waters, instruct INS officers to be "constantly watchful for any indication (including bare claims) that a person or persons on board the interdicted vessel may qualify as refugees *under the United Nations Protocol."* Interdiction Guidelines at 3 (emphasis added). Moreover, the opening section of the guidelines describes the function of INS officers taking part in the Interdiction Program as being "to ensure that the United States is in compliance with its *obligations* regarding actions toward refugees." INS Guidelines at 1 (emphasis added). In addition, "Article 33, United Nations Convention and Protocol Relating to the Status of Refugees," is listed prominently among the "Authority" set forth on the second page of the Guidelines.[9]

To be sure, the question whether Article 33's protections against non-refoulement extend to the Haitians being interdicted in international waters, like the question regarding the self-executory nature of the Protocol, is a close one. However, as the Supreme Court has held, "Treaties are to be construed in a broad and liberal spirit[,] and when two constructions are possible, one restrictive of rights which may be claimed under it, and the other favorable to them, the latter is preferred." *Asakura v. Seattle,* 265 U.S. 332, 342, 44 S.Ct. 515, 516, 68 L.Ed. 1041 (1924). In this light and based on the foregoing, we conclude that HRC has demonstrated a substantial likelihood that the right against refoulement can be asserted in the present case.

In light of the evidence discussed in section C(2) below, we also find a substantial likelihood that plaintiffs will otherwise prevail on the merits. In other words, we find a substantial likelihood that defendants' actions in carrying out the interdiction program violate plaintiffs' right of non-refoulement under Article 33 of the Protocol, in that the actions fall short of procedural safeguards set forth in the INS Guidelines.

### (2) The First Amendment

HRC claims that its first amendment right of access to the interdicted Haitians has been violated by defendants' action of forcibly returning the interdictees.[10] While

---

9. Ensuring compliance with international obligations, the Guidelines continue, includes "the necessity of being keenly attuned during any interdiction program to any evidence which may reflect an individual's well-founded fear of persecution by his or her country of origin for reasons of ... political opinion." *Id.*

10. HRC also states that "such Haitians have a correlative First Amendment right. Memorandum in Support of Motion for Preliminary Injunction at 36. HRC argues that *Kleindienst v. Mandel* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) does not support defendants' argument that excluded aliens have no first amendment rights. Rather, *Kleindienst* holds only that aliens have no first amendment right of entry. *Id.* at 762, 92 S.Ct. at 2581 (holding that while United States citizens could assert first amend-

ment right to hear and speak and meet with excluded alien, alien had no constitutional right of entry). However, the United States Supreme Court held early on that excluded aliens may not assert First Amendment Rights. *United States ex rel. Turner v. Williams,* 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979 (1904) (holding that alien could not assert first amendment right of freedom of speech because "those who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise."). *Compare Bridges v. Wixon,* 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945) (holding that resident aliens have first amendment rights). Also, the Court recently emphasized that aliens generally receive constitutional protections only when they have come within United States territory and developed substantial connections with this

the interdictees are detained on the Coast Guard cutters and the Guantanamo Base, they are denied information concerning their rights, the availability of counsel, and assistance in making their asylum claims.

The Eleventh Circuit has recognized that "the Supreme Court has repeatedly emphasized that counsel have a First Amendment right to inform individuals of their rights, at least when they do so as an exercise of political speech without expectation of remuneration." *Jean v. Nelson*, 727 F.2d 957, 983 (1984) (citing *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *NAACP v. State ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). HRC alleges precisely this first amendment right: the right to counsel and meet with the interdicted Haitians as an exercise of political speech and with no expectation of remuneration.[11]

In *NAACP v. Button*, the Court held that the activities of the NAACP, its affiliates and legal staff in discussing and advising groups about their legal rights were modes of expression and association protected by the first amendment. 371 U.S. at

428–29, 83 S.Ct. at 335. The Court reaffirmed this holding in *In re Primus*, finding that a nonprofit organization that pursued litigation as a means of political expression and association was protected by the first amendment. 436 U.S. at 426–28, 98 S.Ct. at 1901–02. Also, in *Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 531–32 (S.D.Fla.1980). The court explicitly recognized HRC's first amendment right to solicit clients in INS facilities.

The defendants contend that HRC lacks first amendment rights of access to the interdictees based on *Ukrainian–American Bar Association v. Baker*, 893 F.2d 1374, 1381 (D.C.Cir.1990), where the UABA challenged the government's refusal to inform Soviet and East Bloc detainees of its willingness to provide free legal services. The court held that the plaintiffs first amendment right of access to potential clients did not establish an affirmative right to the government's interest in providing UABA literature to detainees. *Id.* at 1382. However, *Ukrainian–American Bar Association* is distinguishable because, unlike the UABA, HRC is not asserting that its First Amendment right imposes any affirmative obligation on the

country. *United States v. Verdugo–Urquidez*, 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990).

**11.** Significantly, the Supreme Court has recognized a first amendment right to associate with an excluded alien. *Kleindienst v. Mandel*, 408 U.S. 753, 765, 92 S.Ct. 2576, 2582, 33 L.Ed.2d 683 (1972). However, in *Kleindienst v. Mandel*, the Supreme Court decided the narrow issue of whether the first amendment conferred upon the plaintiff professors the ability to compel the Attorney General to admit a nonresident alien with whom they wished to speak, debate and hear in person. 408 U.S. at 753, 92 S.Ct. at 2576. The Court held that where the Attorney General has a "facially legitimate and bona fide reason" not to waive the statutory exclusion of an alien, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.* at 769–70, 92 S.Ct. at 2372.

The defendants argue that *Kleindienst* governs this case. However, as noted above, the Court there addressed only the very narrow issue of whether the plaintiffs could assert their first

amendment right to compel the entry of an alien. Unlike the plaintiffs in *Kleindienst*, HRC does not seek an order compelling the entry of the interdicted Haitians. Consequently, we conclude that *Kleindienst* does not control this case. Moreover, even if the *Kleindienst* standard did apply in this case, we are not convinced that the defendants have advanced a "facially legitimate and bona fide reason" for excluding the Haitian refugees.

In *Kleindienst*, the facially legitimate and bona fide reason for exclusion offered by the Attorney General was prior abuse of visa privileges, namely, that the alien's activities in the United States during a prior visit "went far beyond the stated purposes of his trip, on the basis of which his admission had been authorized and represented a flagrant abuse of the opportunities afforded to him to express his views in this country." *Id.* at 758–59, 769, 92 S.Ct. at 2579–80, 2585. Unlike the Attorney General in *Kleindienst*, the government has offered no "facially legitimate, bona fide reason" for returning the interdicted Haitians. In fact, if the very process by which the government could ascertain any facially legitimate, bona fide reason is as defective as the plaintiff alleges, it might be impossible for the government to offer such a reason.

part of defendants. Instead, HRC seeks reasonable and meaningful access that is consistent with the government's time, place and manner restrictions.

Relying on *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), HRC argues that the first amendment serves as a limitation on governmental action wherever that action may occur. In *Reid v. Covert*, the Court stated that "the United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations of the Constitution." *Id.* at 5, 77 S.Ct. at 1224. Accordingly, the Court held that United States citizens tried by United States military authorities in a foreign country were entitled to the protections of the fifth and sixth Amendments. *Id.* at 7–9, 77 S.Ct. at 1225–26.

The defendants argue that in light of *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), HRC cannot rely on *Reid v. Covert* as establishing its claim to offshore First Amendment protection. We disagree. In *Verdugo–Urquidez*, the Court simply distinguished *Reid* as standing for the proposition that only United States *citizens*, as opposed to aliens, abroad could invoke the protection of the Fifth and Sixth Amendments. 494 U.S. at 270, 110 S.Ct. at 1063. We find a substantial likelihood that HRC, a Florida nonprofit corporation, may invoke constitutional rights abroad under either *Reid* or *Verdugo–Urquidez*.

■ Also, the United States' lease of the land for the Guantanamo Naval Base provides that "during the period of occupation by the United States of said areas under the terms of this agreement the United States shall exercise complete jurisdiction and control over and within said areas ..." Defendants' Exhibits Opposing Injunctive Relief, Exhibit 9, at 2. We find a substantial likelihood that a United States citizen can invoke the first amendment in an area over which the United States exercises complete jurisdiction.

Having concluded that HRC has asserted a right which falls within the scope of the first amendment, and having found a substantial likelihood that HRC may invoke the protection of the first amendment abroad, particularly in an area controlled by the United States, we now turn to the more difficult question of whether the level of protection afforded by the Constitution gives HRC a right of access to the military facilities.

The "First Amendment does not guaranty access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). The Eleventh Circuit addressed a newspaper publisher's first amendment right of access to a military base in *M.N.C. Hinesville v. U.S. Dept. of Defense*, 791 F.2d 1466 (11th Cir.1986). The court stated in determining the level of protection afforded by the first amendment, that two factors determine the burden that the government must shoulder in justifying its restriction of the first amendment activity: the nature of the forum where the speech takes place and the nature of the restriction. *Id.* at 1472.

■ The nature of the forum in which a speaker wishes to convey its message is relevant to the government's ability to regulate that speech. For example, in public forums such as streets and parks, the government's ability to restrict speech is at its minimum. However, in nonpublic forums the government enjoys its widest latitude in restricting speech. *Id.* at 1472–73 (citing *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Military bases are generally nonpublic forums. *M.N.C. of Hinesville*, 791 F.2d at 1473. The defendants' action of establishing the detainee center at the military base has not converted it into a public forum because it has not opened the base to indiscriminate use by the public. *Greer v. Spock*, 424 U.S. 828, 835, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976) (citing *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (military abandoned claim to special interest in street running through military base by allowing

indiscriminate public use)). The military facilities to which HRC seeks access are clearly a nonpublic forum. However, in order to determine the level of justification that the government must show to sustain its restriction on the asserted first amendment right, we also must examine the nature of the restriction. *M.N.C. of Hinesville*, 791 F.2d at 1474.

As noted above, the government has wider latitude in regulating speech in nonpublic forums. In nonpublic forums, the government may subject speech to reasonable content-neutral, time, place and manner restrictions. *Id.* (citing *Perry*, 460 U.S. at 46, 103 S.Ct. at 955). In addition to time, place and manner restrictions, the government may reserve the forum for its intended purposes as long as the restriction on speech is reasonable and not an effort to restrain expression because the government opposes the speaker's view. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. Because there is no allegation that the defendants' denial of access to the interdictees constitutes viewpoint discrimination, the test is whether the restriction is "reasonable in light of the purpose which the forum at issue serves." *Id.* at 49, 103 S.Ct. at 957.

In this case, HRC seeks access to that portion of the base which is used for detaining the refugees. The purpose that the forum at issue serves, at least during the present crisis, is to detain interdicted Haitians. Certainly, the government has security and administrative interests in this particular forum; however, the government also has stated that it too has an interest in not wrongfully returning interdictees who qualify for political asylum. We question whether denying HRC access to the interdictees is consistent with that interest and whether the restriction is reasonable in light of the difficulty the government appears to be having in administering adequate procedures for screening the interdictees. Conversely, HRC's interest does not appear to be inconsistent with the government's purpose.

Another factor in determining the reasonableness of a challenged restriction is the existence of alternative means of exercising a first amendment right of the challenged restriction. *See Perry*, 460 U.S. at 53, 103 S.Ct. at 959; *M.N.C. of Hinesville*, 791 F.2d at 1476; *see also, Jean v. Nelson*, 727 F.2d at 983 (finding that challenged restrictions on HRC's access to Haitians did not "amount to an absolute denial of access"). Under the extraordinary circumstances of this case, HRC has no alternative means of exercising the particular first amendment right asserted, the right of access to the interdicted refugees. The gravity of HRC's asserted right of access and the lack of alternative means of exercising that right is highlighted by the likelihood that some of the interdictees returned to Haiti will face persecution or even death— the very result HRC desires to prevent by exercising its right to associate with these individuals.

 Concededly, we have reservations about HRC's right of access to a military installation. Nevertheless, in light of the factors discussed above and the highly unusual circumstances of this case, we are not convinced that the challenged restriction is reasonable. Accordingly, we find that HRC has demonstrated a substantial likelihood that it will succeed on its first amendment claim—especially where it seeks only reasonable access consistent with the government's reasonable time, place and manner restrictions.

### (3) Remaining Claims

With respect to plaintiffs' remaining claims—under the fifth amendment, Executive Order 12324 and guidelines promulgated pursuant thereto, the Refugee Act of 1980, the Immigration and Nationality Act, and the Administrative Procedure Act— without, of course, adjudicating the claims on the merits, we find no substantial likelihood that the rights asserted are judicially enforceable under the present circumstances.

 First, plaintiffs allege that defendants' interdiction and repatriation procedure violates the fifth amendment to the United States Constitution's guarantee of due process of law. Aliens who successfully enter the United States are entitled to

due process protections with respect to immigration matters. *See Jean v. Nelson,* 727 F.2d 957, 967 (11th Cir.1984) (en banc). However, the United States Supreme Court "has long held that an alien *seeking* admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon v. Plascencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982); *Jean,* 727 F.2d at 967 (holding that aliens outside United States have no rights under U.S. Constitution). Based on this binding precedent, HRC's fifth amendment argument must fail.

▮ Second, plaintiffs assert the violation of rights arising under the Refugee Act of 1980, *see* 8 U.S.C. § 1521, and the Immigration and Nationality Act, *see* 8 U.S.C. § 1253. A review of the relevant statutes reveals that HRC's claims must fail because the statutory rights and protections asserted are reserved, by the very terms of the statutes, to aliens within the United States. *See* 8 U.S.C. § 1158(a) (providing for establishment of procedures only for aliens "physically present in the United States or at a land border or port of entry"); *id.* §§ 1251, 1253(a) (providing deportation provisions only for aliens "in the United States"). Courts making the present inquiry have uniformly determined that Haitians interdicted on the high seas are unentitled to the rights and protections arising under the Refugee Act of 1980 and the Immigration and Nationality Act. *See, e.g., Haitian Refugee Center, Inc. v. Gracey,* 600 F.Supp. 1396, 1403–04 (D.C.D.C. 1985), *aff'd on other grounds,* 809 F.2d 794 (D.C.Cir.1987).

▮ Third, plaintiffs argue that defendants' actions violate Executive Order 12324, which, as discussed earlier, provides that "no person who is a [political] refugee will be returned without his [or her] consent," and that the Attorney General shall take all steps necessary "to ensure ... the strict observance of our international obligations concerning those who genuinely flee persecution in their homeland." Plaintiffs also contend that defendants' actions violate the INS Guidelines promulgated pursuant to the Executive Order. Based

on binding precedent, we find no substantial likelihood that a judicially enforceable right arises from either the Executive Order, *see Farkas v. Texas Instrument, Inc.,* 375 F.2d 629, 632–33 (5th Cir.1967) (declining to find that executive order creates right of action), or from the accompanying INS Guidelines, *see Pasquini v. Morris,* 700 F.2d 658, 662 (11th Cir.1983) (holding that "[t]he internal operating procedures of the INS are for the administrative convenience of the INS only"); *Dong Sik Kwon v. INS,* 646 F.2d 909, 918–19 (5th Cir.1981) (stating that INS operations instructions "do not have the force of law"). *But see Nicholas v. Immigration and Naturalization Service, Inc.,* 590 F.2d 802, 806 (9th Cir.1979) (determining that INS guideline "far more closely resembles a substantive provision for relief than an internal procedural guideline").

▮ Fourth and finally, plaintiffs contend that the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.,* provides a source of judicially enforceable rights. Based upon our review of the law, however, we find that HRC has failed to show a substantial likelihood that the APA would provide the relief sought, primarily because it appears that the actions in question are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The statutory provision under which the interdiction program is principally carried out provides the following:

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose upon the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). By this provision, Congress has delegated to the President extremely broad discretion to act. Moreover, because exercise of this discretion is not limited to circumstances defined in the statute, but rather is geared to Executive

"find[ings]" and what is "deem[ed]" necessary or appropriate, the statute provides no discernable standards by which this court can review the challenged actions under the APA. *See CC Distributors, Inc. v. United States,* 883 F.2d 146, 153–54 (D.C.Cir.1989); *Greenwood Utilities Comm'n v. Hodel,* 764 F.2d 1459, 1464 (11th Cir.1985).

### 2. Irreparable Injury to Plaintiff

■■■ We next consider whether plaintiffs have demonstrated a substantial threat of irreparable injury if the injunction does not issue. In sum, plaintiffs argue that in the absence of injunctive relief, they and their class members will be returned to Haiti, where they stand to be persecuted on account of their political opinion. The government responds that the Haitians already are provided a meaningful opportunity to present any political asylum claims, and therefore that no irreparable injury would occur. The government also notes that defendants "ensure that the international committee of the Red Cross is notified to meet the returning [Haitian] migrants upon arrival." Leahy Statement at 4. Based on the evidence, we have no difficulty finding that plaintiffs have demonstrated a substantial threat of irreparable injury in the absence of an injunction.

The most substantial threat of injury facing plaintiffs in the absence of injunctive relief is loss of liberty or death at the hands of Haiti's military on the account of plaintiffs' political beliefs. The related threat in the absence of an injunction, which causes the threat of death, is that defendants' process of screening political asylum claims will continue to fall short of the procedures provided in the Guidelines. A quick review of the depositions of the individual plaintiffs, which the court finds credible, illustrates these danger. The court notes that all the individual plaintiffs described below were interdicted at sea and, despite having substantial political asylum claims, were "screened out" and not allowed to continue the application process. Plaintiff Raymond Edme was a member of a pro-Aristide youth organization; he fled Haiti after he learned the military had come to his home searching for him. Raymond Edme Deposition at 12. Plaintiff Roland Providence, a long-time Aristide supporter, was a delegate responsible for monitoring polling places during the 1990 election; he fled Haiti after learning from his brothers that the military shot up his house looking for him. Roland Providence Deposition at 17. Plaintiff Eric Pierre was a member of Haiti's National Front for Change to Democracy (FNCD), the political coalition supporting Aristide; he fled by sea based on warnings that the army was about to arrest him and the fact that the army had previously been to his home and sprayed it with bullets, killing his father. Eric Pierre Deposition at 7, 11, 22. Plaintiff Golbert Miracle resided with mother and aunts, with whom he worked for the FNCD. On November 8, 1991, a dozen soldiers came to their home. Miracle's mother, who was in the courtyard in the front of the home, was shot to death by the soldiers. Miracle's aunt and sisters were arrested by the soldiers and their whereabouts are unknown. Golbert Miracle Deposition at 5–10, 27. Plaintiff Roland Jean was a member of the "Komite Ti–Legliz" (Committee of Small Churches), which constituted an important segment of national support for Aristide. On November 5, 1991, Haitian police forcibly arrested his father, also a known Aristide supporter. Jean managed to escape arrest and fled Haiti. Roland Jean Declaration at 7, 8, 21.

The circumstances described above strongly suggest that plaintiffs have well-founded fears of political persecution if returned to Haiti. The related threat in the absence of an injunction, which directly leads to the above-described threat of death, is that defendants' process of screening political asylum claims will continue to fall short of standards rendering the process meaningful. Certainly, an INS officer following the INS Guidelines' mandate to "be constantly watchful for any indication (including bare claims) that a person ... may qualify as [a] refugee" would be substantially unlikely to screen-out, during the preliminary questions, the persons described above.

Indeed, the circumstances recounted by the plaintiffs above suggest that some INS screeners are failing to follow the INS Guidelines. Raymond Edme, for example, after telling his screener that the military was searching for him on account of his political affiliation, was not ever asked about the nature of this affiliation. Raymond Edme Deposition at 8–9. Roland Providence, the long-time Aristide supporter and polling-place delegate whose house was shot up by members of the military looking for him, was rushed through his interview and not given an opportunity to explain his story in any detail. Roland Providence Deposition at 19. Eric Pierre, the FNCD member whose father was killed by a military search party which sprayed Pierre's home with bullets, was not asked about his FNCD membership or otherwise given an opportunity to state his claim in any detail. Eric Pierre Deposition at 5, 13–20. Golbert Miracle, whose mother was shot and killed and aunt and sisters were arrested and disappeared, apparently on the basis of their affiliation with a group to which Miracle belonged, was given only three minutes to state his claim; moreover, even before the interview started, his interviewer said " 'Everybody comes here and talks about one thing, politics, politics. Whatever you do, you are going to be sent back. Whatever you do.' " Golbert Miracle Deposition at 16 (quoting interviewer); *id.* at 21–22. Plaintiff Roland Jean, the member of "Komite Ti–Legliz" who managed to escape arrest when Haitian police forcibly arrested his father, was informed by his interpreter that he would be sent back to Haiti because he lacked proper respect for the military. Roland Jean Deposition at 14. An additional way in which the screening process falls short of meaningful review, e.g., compliance with the INS Guidelines, is due to interviewers' not informing the interdictees of the purpose of the interviews. Pierre Delios Declaration at 13.

Defendants attempt to minimize the harms advanced by plaintiffs in two ways. First, they point to follow-up procedures designed to monitor repatriated Haitians and to verify their safety. For example, defendants advance the notion that the re-patriated Haitians are entrusted to the care of the Haitian Red Cross. *See* Aronson Declaration. However, the Haitian Red Cross is not a member of the International Red Cross and is not independent of government interference and pressure. *See* Jocelyn McCalla Declaration at 12. Indeed, the head of the Haitian Red Cross, Dr. William Fougere, was only recently appointed by the military regime. *Id.* Moreover, "[t]he Haitian military considers persons who fled Haiti by boat after the coup to be Aristide partisans, enemies of the military." Declaration of Jean–Claude Jean (soldier in Haitian Armed Forces) at 3. Second, defendants assert that the screening procedures presently in place keep low the risk of repatriating Haitians with bona fide political asylum claims. However, as discussed above, the procedures presently in place appear substantially inadequate.

We find that the individual plaintiffs have shown a substantial threat that the absence of injunctive relief will cause the most irreparable type of injuries. This threat also exists with respect to the potential class members. *See, e.g.,* Yvette Dieudonne Declaration at 2; Pierre Delios Declaration at 3, 5. The threat also creates an additional one—an adverse effect on HRC's first amendment rights to counsel and associate. Though extradition of aliens "is always a harsh measure, it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country." *Immigration and Naturalization Service v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987). Accordingly, plaintiffs have shown a substantial threat of irreparable injury and therefore met the second test required for issuance of preliminary injunctive relief.

### 3. Balance of Injury

We next consider whether plaintiffs have shown that the threatened injury to plaintiff outweighs the threatened harm an injunction may cause defendants. As discussed above, the threatened injury to plaintiffs is significant. In the absence of a preliminary injunction, hundreds of Hai-

tians may be returned to Haiti to face possible political persecution. Such a result will adversely affect not only the claims and lives of the Haitians, but also the HRC's first amendment rights to counsel and associate. Against this threatened injury we must balance the harm an injunction will cause defendants, who allege three types of harm. First, defendants assert that an order prohibiting the repatriation of any Haitians will cause the expenditure of millions of dollars. Second, they contend that requiring the use of Coast Guard cutters to house Haitians precludes the cutters' use for other important tasks, such as the interdiction of illegal drugs, the enforcement of fisheries laws, and the execution of search and rescue missions. Finally, defendants. assert that the use of Guantanamo Bay to house Haitians whom the defendants are enjoined from repatriating risks fouling diplomatic relations between the United States and Cuba.

The court does not take these harms lightly. Nevertheless, for two reasons the court determines that plaintiffs have demonstrated that the balance of harm weighs in their favor. First, the injunctive relief provided herein is alternative. Defendants are enjoined from repatriating Haitians only until such time as the court reaches the merits of the underlying lawsuit *or* defendants implement and follow procedures, such as the INS Guidelines, which are adequate to ensure that class members are not forcefully returned to a country where, on account of their political opinion, their life and liberty are threatened by a brutal and illegitimate military regime. In other words, the harm advanced by defendants would be ameliorated were defendants to implement and follow adequate procedures, such as those provided by the INS Guidelines, for screening potential asylum applicants.

Second, the court finds that the largely liberty- and life-implicating threats of injury to plaintiffs outweigh the largely financial threat of harm to defendants. *Cf. Federation of Japan Salmon Fisheries Coop. Ass'n v. Baldridge*, 679 F.Supp. 37, 48 (D.D.C.1987) (involving balancing of economic harm); *DiDomenico v. Employers*

*Coop. Indus. Trust*, 676 F.Supp. 903, 908 (N.D.Ind.1987) (recognizing importance of sanctity of life). Moreover, to the extent that the other harms alleged by defendants are nonfinancial, they are largely speculative.

### 4. Disservice to Public Interest

█ Finally, we determine that plaintiff has demonstrated that granting the injunction will not disserve the public interest. Indeed, the injunction requested will serve the public interest. The public undoubtedly has an interest in the United States' living up to its international obligations, particularly where the failure to live up to those obligations might result in the loss of life and liberty by political refugees fleeing a country ruled by a brutal and illegitimate military regime. *Cf. DiDomenico*, 676 F.Supp. at 908 (noting that "[w]ith respect to public interest, it suffices to state that the interest in the sanctity and quality of life is paramount"). This public interest is particularly strong where the people facing such persecution have risked their lives to support a democratic movement in a country that had not experienced democracy in over 200 years.

### D. CONCLUSION

For the foregoing reasons, the court determines that plaintiffs are entitled to the requested injunctive relief. Accordingly, defendants are hereby enjoined from forcefully repatriating the individual plaintiffs or class members in their custody either until the merits of the underlying action are resolved or until defendants implement and follow procedures, such as those contained in the INS Guidelines, adequate to ensure that Haitians with bona fide political asylum claims are not forced to return to Haiti in violation of Article 33 of the Protocol. To this end, within seven days defendants shall submit to the court a recital of the procedures to be followed.

The court again stresses that the relief provided herein does *not* grant plaintiffs entry to this country, but merely prohibits their forced return to Haiti until the court reaches the merits of the underlying law-

suit or defendants implement and follow procedures adequate to ensure that plaintiffs and class members are not forcefully returned to a country where their life and liberty are threatened on account of their political opinion.

Finally, plaintiff HRC, a not-for-profit corporation, shall post a personal bond in the amount of $5,000 by 5 p.m. on Wednesday, December 4, 1991, in conformity with Rule 65(c), Federal Rules of Civil Procedure. The individual plaintiffs and class members, in light of their inaccessibility, are not required to post security, the court finding that the posting of bond by HRC satisfies the mandate of Rule 65(c).

DONE AND ORDERED.